## OCEANIC STEAM NAV. CO. v. CORCORAN.

(Circuit Court of Appeals, Second Circuit. June 27, 1925.)

No. 204.

**1. Shipping ☜140—Under admiralty law, common carrier by contract cannot exempt self from liability for negligence.**

Under admiralty law of United States, common carrier cannot by contract exempt itself from responsibility for loss or damage from negligence of its officers or crew.

**2. Carriers ☜280(1), 307(1)—Carriers are bound to exercise utmost care and diligence, and contracts permitting abandonment of duty void.**

Common carriers are bound to exercise the utmost care and diligence in performance of their duties, and contract allowing carrier to abandon its obligations to public is illegal and void.

**3. Carriers ☜307(4)—Agreement fixing reasonable time within which claim for injuries may be made valid.**

Agreement requiring injured party or his representative to give carrier notice in writing of claim within a specified reasonable period is valid.

**4. Carriers ☜307(1)—Under law of England, carrier may exempt itself from liability for its own or agent's liability.**

Under the law of England, carrier may exempt itself from liability for its own or its agent's negligence.

**5. Shipping ☜142—Under law of England, requirement that passenger's notice of claim be given within three days after landing is valid.**

Under the law of England, requirement that notice of passenger's claim for injuries be given within three days after landing is reasonable and valid.

**6. Shipping ☜142—Provision as to time for passenger's filing of claim for injuries held unreasonable.**

Under law of United States, requirement that passenger's notice of claim for injuries be made within three days after landing is unreasonable.

**7. Shipping ☜140—Provision of steamship ticket for carriage to be performed without United States, exempting shipowner from liability from negligence, held void.**

Provision of steamship ticket sold in Boston, for transportation from Montreal to Liverpool, exempting shipowner from liability for negligence *held* contrary to public policy and unenforceable in courts of United States, notwithstanding further provisions that all questions arising under that paragraph of contract should be decided according to English law, under which such exemption clause was valid.

**8. Contracts ☜108(1)—Agreement contrary to public policy is absolutely void, regardless of solemnity with which it was made.**

Agreement made in United States contrary to public policy is absolutely void and unenforceable, no matter how solemnly it may be made.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Katherine Corcoran against the Oceanic Steam Navigation Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The parties are hereinafter designated in the capacity in which they appeared in the court below. The defendant is a corporation organized under the laws of the United Kingdom of Great Britain and Ireland. It is a common carrier of passengers. It owns and operates a line of steamships running between England and the United States and

Canada, known as the White Star-Dominion Line. The writ of error brings to this court for review a judgment rendered in favor of the plaintiff on June 3, 1924, for the sum of $25,289.40.

The action was commenced in the Supreme Court of the state of New York, county of Nassau, on October 1, 1923. It was removed to the United States District Court on October 19, 1923. It was brought to recover damages for injuries which the plaintiff alleged she suffered while a passenger on one of defendant's steamships, the Canopic, while on her way from Montreal to Liverpool. The complaint alleged that the injuries the plaintiff suffered were occasioned by defendant's negligence. The material allegations of her complaint are the following:

"Sixth. That the defendant prior to and at the time hereinafter mentioned, by its officers, agents, servants, and employees, was careless and negligent in its duty of safeguarding the plaintiff, in that it failed to maintain the porthole of the plaintiff's cabin closed, locked, and securely fastened, and in a safe, proper, and adequate condition, and further in that it failed to warn plaintiff of the inadequate, defective, unsafe, and dangerous condition of the porthole as aforesaid, which said dangerous condition was fully known to the defendant, its officers, agents, servants, and employees, but of which the plaintiff was wholly ignorant.

"Seventh. That on or about the 30th day of June, 1922, at about 6:30 in the morning, while plaintiff was sleeping as a passenger in her said cabin, a large volume of water broke suddenly with great force through the said porthole into the plaintiff's cabin and upon the plaintiff, causing her to sustain great terror and shock and to fall or be thrown violently to the floor, so that her right ankle was fractured and the plaintiff rendered for a time unconscious.

"Eighth. That solely by reason of the premises and of the defendant's said negligence and of the wrongful and negligent treatment afforded to plaintiff for her injuries by the defendant, without any fault or negligence on her part, the plaintiff became and still remains, and upon information and belief, will be permanently lame, crippled, and disabled and has suffered and continues to suffer severe pain, shock, and mental anguish."

The defendant in its answer set up the terms and conditions of its contract of transportation as contained in the passage ticket:

"Neither the shipowner, agent or passage broker shall be liable to any passenger carried under this contract for loss, damage or delay to a passenger * * * arising from * * * perils of the seas * * * or of navigation of any kind * * * or from causes of any kind beyond the carrier's control, even though the loss, damage or delay * * * may have been caused or contributed to by the negligence or default of the shipowner's servants or of other persons for whose acts he would otherwise be responsible. * * * All questions arising out of this paragraph of the contract shall be decided according to English law with reference to which it is made."

The plaintiff demanded judgment against defendant in the sum of $50,000, together with costs and disbursements. The complaint was amended at the beginning of the trial of the action, so that the amount of the damages demanded was changed from $50,000 to $75,000.

Burlingham, Veeder, Masten & Fearey, of New York City (W. P. Allen and R. H. Caldwell, both of New York City, of counsel), for plaintiff in error.

Thomas J. Cuff, of New York City (Vine H. Smith, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought to recover for personal injuries which the plaintiff suffered in a voyage she made in one of defendant's ships. The plaintiff, who lives in Indianapolis, Ind., was one of a party of four, all being school-teachers and friends. A ticket was issued to them at Boston, and they were booked through to Paris, and given a ticket on the Canopic, which was to carry them from Montreal to Liverpool. The vessel started on its voyage on June 25, 1922. The plaintiff and her three companions occupied the same stateroom, a small room with four berths in it. The plaintiff occupied the upper berth on the sea side of the ship, on the C deck, and the porthole was 8 or 10 inches above her berth. On the night the plaintiff retired, the steward came into her stateroom and opened the porthole, using a wrench to do it. This was around 7 o'clock on the night of June 29th. The porthole was left open, and on the morning of June 30th, about 6:30 o'clock, the sea having become rough, the water poured through the open porthole. The water

streamed in, as one of the party testified, "as though it came out of a hose. It streamed as if the whole ocean was coming in." The witness said she was awakened by water splashing down her neck, and there was a foot of water on the floor of the cabin. Another one of the party testified to being awakened "by this dreadful rush of water. The only thing I can think of is a ·high-pressure fire plug it sounded like. It came in and struck the other side of the room with a thud. The next thing I remember I was scrambling out of the berth; * * * and when I was getting out of the berth another rush of water came and hit me in the back, knocked me to the other side of the room, * * * and, feeling something was wrong, I naturally thought we were sinking, or some other thing was happening. * * *"

The plaintiff testified that she was awakened by the water that poured into her berth from a porthole which the steward had left open. As she lay on the edge of her berth, which was an upper one, she was thrown out of it by the force of the water pouring through the porthole, and landed on the floor in about 8 inches of water. As she tried to rise she felt extreme pain in her right ankle. She testified she looked, and· her "foot seemed to be hanging by a thread, the bone was sticking out, dripping with blood." She fainted, and was carried to the ship's hospital, and was in such extreme pain that she was kept under the influence of morphine.

The accident happened on June 30, 1922. On the arrival of the ship at Liverpool she was taken to a hospital in that city, where she remained until September 25th, when she started for her home in Indianapolis. During the time she was in the hospital, and when she reached home, pus was being discharged from her wound, and during this period the pain was so intense at times the attending physician had to use hypodermics. That the plaintiff's injuries were serious, most painful, permanent, and may finally make necessary an amputation, is amply disclosed by the record. The deposition of the ship's surgeon, speaking of her condition immediately after the accident, said:

"Q. What examination did you make, and what did you find at that time, Doctor? A. Well, there was a compound dislocation; I put down in the log, compound fracture dislocation, chiefly dislocation; her ankle was ripped up; it looked as if the foot was going to fall off; I thought I would have to take it off, at first sight; it looked an awful sight."

And again:

"Q. It was a bad dislocation? A. Yes; compound dislocation.

"Q. In what respect was it bad? A. Any compound thing is bad—open wound.

"Q. Was the foot completely turned around? A. Yes; it looked, when I first saw it, as if it was going to drop off—hanging. I thought sure I would have to take it off at first.

"Q. Miss Corcoran states the astragalus — A. The astragalus was turned upside down and the scaphoid—that was displaced a little bit; it's a very rare form of displacement.

"Q. It is a very rare form of dislocation? A. Oh, yes; to get that astragalus turned upside down."

And a physician of New York City, connected with the Medical School of Columbia University, who made an examination of plaintiff a few days before testifying, and two years after the accident, stated that her condition was permanent and that he advised an amputation of the foot. He testified:

"Q. Examining with the aid of those X-rays, in addition to the examination you made yourself, will you state what you found those X-ray pictures show as to the foot? A. The X-ray revealed the nature of the deformity. They show a destruction, or the results, rather, of a destruction, of the astragalus bone, and they show, when taken in series, taken in three different times, they show a progressive shrinking and eating away of that bone; the last X-ray showing merely a fragment of the bone that I should say represented possibly, certainly not more than, one-fifth of the original size of the astragalus, whereas the X-ray taken the previous year shows a destruction of the bone not quite so far advanced as it is at the present time."

The ticket issued by the White Star Line to the plaintiff provided for second-class passage by the British steamship Canopic from Montreal to Liverpool "upon the following conditions which are agreed upon between the carrier and each passenger." Then followed 12 conditions, the ninth of which reads: "No claim under this ticket shall be enforceable against the shipowner or his property, or the agent or passage broker, unless notice thereof in writing with full particulars of the claim be delivered to the shipowner or agent within three days after the passenger shall be landed from the trans-Atlantic ocean steamer at the termination of her voyage, or, in case of the voyage being

abandoned or broken up, within seven days thereafter."

This ticket was unlike the pasteboard tickets commonly sold in this country to passengers on railroads or steamboats. It covered a large quarto page, with printed matter on both sides, and in the left-hand corner it contained the names of the four women passengers for whose benefit it was issued, one of whom was the plaintiff. It booked each through to Paris. The ticket was issued at the Boston office. It contained in large type at the bottom the following: "Your attention is specially directed to the conditions of transportation in the above contract."

The passengers named in the ticket did not see this ticket until the trial. The arrangements were all made for the persons named on the ticket by a third person, who was the conductor of the party, who purchased the ticket, looked after the baggage, and made all the arrangements. This person was the representative of the Temple Touring Company of Boston. Her services were not paid for by the persons named in the ticket issued. They gave her the money with which the ticket was bought. That ticket she kept in her possession throughout, and, as before remarked, she at no time showed it to them, and the testimony does not show that she ever acquainted them with its provisions. But we do not attach importance to the fact that this plaintiff never saw the ticket or read the conditions printed thereon. If the ticket was never shown her, it may have been her duty to have asked to see it, and then to have read the conditions. Courts have said that persons to whom tickets are issued are expected to read the stipulations, and are not exempted from conditions simply because they fail to read them. They are bound to know what is printed as part of the ticket. Harris v. Great Western Railway, 1 Q. B. D. 515; Burke v. Southeastern Railway, 5 C. P. D. 1; Fonseca v. Cunard Steamship Co., 153 Mass. 553, 556, 557, 27 N. E. 665, 12 L. R. A. 340, 25 Am. St. Rep. 660.

In O'Regan v. Cunard Steamship. Co., 160 Mass. 356, 361, 35 N. E. 1070, 1071 (39 Am. St. Rep. 484), the ticket, it is said, is "a contract by which the plaintiff was bound, even if she did not read it. It was her duty to ascertain its contents, if she cared to know her rights." And such seems to be the English law. In Cook v. T. Wilson's Sons & Co., Limited, [1915] A. C. 740, 895 the court said: "Supposing she [passenger] was not aware that those conditions were printed on the ticket, but nevertheless the defendants did all that was reasonably sufficient to give notice of the conditions, the defendants are entitled to judgment." And again at page 896 the court said: "It [the ticket] is a large plain piece of paper put before a lady of intelligence. * * * It seems to me that the plaintiff, on having that piece of paper put in front of her, ought to have seen that she had a passenger contract, and, having seen that, she ought to have seen that she was entitled to her berth subject to the conditions on the ticket, and, having seen that, she ought to have seen all the rest. It is impossible to say that the companies are to provide for people who will not choose to read what is put straight in front of them."

[1] But, in the view we take of this case, it is not important to decide, and we do not decide, whether she was bound to know the conditions printed on the face of the ticket. Under the admiralty law of the United States, a common carrier by sea cannot by any contract it makes exempt itself from all responsibility for loss or damage by perils of the sea arising from the negligence of its officers or crew. Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788; Railroad Co. v. Lockwood, 17 Wall. 357, 359, 363, 384, 21 L. Ed. 627. It is a fundamental principle of that law that common carriers are bound to exercise the utmost care and diligence in the performance of their duties.

[2] The courts of the United States recognize the fact that a common carrier and his customer do not stand upon a footing of equality, and that the individual customer has no real freedom of choice. "He cannot afford to higgle or stand out." He prefers to accept any bill of lading the carrier tenders him, for in many cases he has no alternative; and it is against the policy of the law to allow a public carrier to abandon its obligations to the public by stipulating for exemptions which are unreasonable, and which excuse it from negligence in the performance of its duty. That such contracts are illegal and void under our law is well settled. See Railway Co. v. Stevens, 95 U. S. 655, 24 L. Ed. 535; Baltimore & Ohio Southwestern Ry. Co. v. Voigt, 176 U. S. 498, 505, 20 S. Ct. 385, 44 L. Ed. 560; Santa Fé, Prescott & Phenix Ry. Co. v. Grant Brothers Construction Co., 228 U. S. 177, 184, 33 S. Ct. 474, 57 L. Ed. 787; Pierce Co. v. Wells, Fargo & Co., 236 U. S. 278, 283, 35 S. Ct. 351, 59 L. Ed. 576; Norfolk

Southern R. R. Co. v. Chatman, 244 U. S. 276, 37 S. Ct. 499, 61 L. Ed. 1131, L. R. A. 1917F, 1128.

[3] But an, agreement that the carrier shall not be liable for negligence, unless the injured party or his representative gives notice in writing of his claim within a specified period, is good under our law if the period named is a reasonable one. Gooch v. Oregon Short Line R. R. Co., 258 U. S. 22, 42 S. Ct. 192, 66 L. Ed. 443; Southern Pacific Co. v. Stewart, 248 U. S. 446, 449, 450, 39 S. Ct. 139, 63 L. Ed. 350; St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird, 243 U. S. 592, 602, 37 S. Ct. 462, 61 L. Ed. 917.

[4] In England, however, a different rule prevails, and it is there settled that a public carrier may exempt itself from liability for its own or its agents' negligence. Henderson v. Stevenson, L. R. 2 H. L. Sc. 47, 2 R. (H. L.) 71; Parker v. Southeastern Ry. Co., 2 C. P. D. 416; Richardson, Spence & Co. v. Rountree (1844) S. C. 217; Price v. Union Lighterage Co., [1904] 1 K. B. 412; Pyman S. S. Co. v. Hull, etc., R. Co., [1904] 2 K. B. 788; Baxter's Leather Co. v. Royal, etc., Packet Co., [1908] 2 K. B. 626; The Marriott v. Yeoward, [1909] 2 K. B. 987; Cook v. T. Wilson's Sons & Co., Ltd., [1915] 85 L. J. K. B. 88; Hood v. Anchor Line, Ltd., [1918] A. C. 837, 849; Charles Wade & Co., Ltd., v. London & N. W. Ry. Co., [1921] 1 K. B. 582; Jones v. Oceanic Steam Navigation Company, Limited, [1924] 40 Times Law Reports, 847, 849.

[5] In the instant case the condition in the ticket did not absolutely relieve the carrier from any and all liability for negligence, but, as has already appeared, it was intended to relieve the carrier from liability, unless notice was given in writing with full particulars of the claim "within three days after the passenger shall be landed." The English courts hold that a requirement that notice must be given within three days after landing is reasonable and valid. Jones v. Oceanic Steam Navigation Company, Limited, supra. The court, in the case cited, said: "He [his lordship] had already held that the contract was governed by English law, and therefore the question of reasonableness did not arise; but, even if it did, he could not hold that the condition was unreasonable." And in the same case the court was asked to hold that the condition had in substance been satisfied, because full particulars of the accident had been made to the defendants by the ship's surgeon and others. But this the court refused to hold, his Lordship stating that "he did not think that the reports referred to could be treated as equivalent to notice of a claim, and they were consistent with the possibility that no claim would follow."

[6] In the instant case, notice of claim, it is admitted, was not given within the prescribed period. But in our opinion the fact that it was not so given is immaterial, the time of three days being unreasonable under the circumstances. In the Gooch Case, supra, the Supreme Court held valid a requirement that notice of personal injuries should be given within 30 days. It did not appear that the plaintiff's injuries disabled him from complying with the condition. Chief Justice Taft and two Associate Justices dissented, on the ground that, as Congress had made unlawful a notice of claim less than 90 days in claims for injuries to property, the courts of the United States ought not to say that a shorter notice was reasonable in claims for injuries to the person.

[7] But is this case to be decided under the law of the United States, which is the place where the contract was made, lex loci contractus, or by the law of Great Britain, lex loci solutionis, the law of the place where the contract was to be performed? The contract was for the transportation of the plaintiff on a British ship to Liverpool. If the case is to be decided by the law of the United States, then it must be decided without reference to the three days' notice requirement, which we have already decided is void under the law of the United States on the ground of its unreasonableness.

In 1760 Robinson v. Bland, 2 Burr. 1077, an action was brought on a bill of exchange drawn at Paris by an Englishman and payable on himself in England. It was said, respecting it at the argument, that ex comitate the law of France should govern it. Lord Mansfield replied: "I admit that there are many cases where the law of the place of the transaction shall be the rule, and the law of England is as liberal in this respect, as other laws are. This is a large field, and not necessary now to be gone into." It was not necessary to "go into it" because, as Mansfield pointed out, under the law of both countries the transaction was void as the bill was given for a gambling debt. And Mr. Justice Wilmott, in the same case, said: "Indeed, whether an action can be supported in England, on a contract which is void by the law of England, but valid by the law of the country where the matter was transacted, is a great question."

No doubt questions arising out of conflict of laws of different nations opened up "a large field" in the days of Lord Mansfield. The lapse of a century and a half has settled some questions, but the field remains "large," as do the perplexities of the courts. The ticket was issued at the Boston office of the defendant. And there is authority for saying that the place where a contract is made does not necessarily determine its validity or its effect. There are cases in which the Supreme Court of the United States has laid it down that when the contract is to be performed in a place other than the place where it is made, the law of the place of performance governs the validity, nature, obligation, and effect rather than the law of the place where it is made. London Assurance Co. v. Companhia de Moagens Do Barreiro, 167 U. S. 149, 161, 17 S. Ct. 785, 42 L. Ed. 113. And in Andrews v. Pond, 13 Pet. 65, 10 L. Ed. 61, Chief Justice Taney writing for the court said: "The general principle in relation to contracts made in one place, to be executed in another, is well settled. They are to be governed by the law of the place of performance."

Chief Justice Marshall, in 1825, in Wayman v. Southard, 10 Wheat. 1, 48 (6 L. Ed. 253), stated it as a principle of universal law "that in every forum a contract is governed by the law with a view to which it was made." And in 1760 Lord Mansfield in Robinson v. Bland, supra, said: "The law of the place can never be the rule, where the transaction is entered into with an express view to the law of another country, as the rule by which it is to be governed." In Pritchard v. Norton, 106 U. S. 124, 1 S. Ct. 102, 27 L. Ed. 104, the question was elaborately considered as to the law to be applied to a written obligation executed in New York which was to be performed in Louisiana. It was held that the validity of the contract was dependent, not upon the law of New York, but upon that of Louisiana, as the lex loci solutionis.

A very interesting discussion of this question is found in Pope v. Nickerson, 19 Fed. Cas. 1022, No. 11,274, Judge Story, sitting as a Circuit Justice in 1844, stated the law as follows: "In general, it may be said, that the validity, the nature, the interpretation, and the obligations of contracts are to be governed by the lex loci contractus, that is, by the law of the place. where the contract is made, if it is to be performed there; but if it is to be performed in another place, then it is to be governed by the law of the latter place." He then goes on to discuss the power of a master of a foreign ship to bind its owners and says:

"If the ship is owned and navigated under the flag of a foreign country, the authority of the master to contract for, and to bind the owners, must be measured by the laws of that country, unless he is held out to persons in other countries, as possessing a more enlarged authority. He is but an agent, and no person dealing with him has a right to suppose that he is clothed with any authority beyond what the laws of the country, to which the ship belongs, deduces from the nature of his employment, or which, by his instructions, express or implied, he is held out to the world to possess. If any person chooses to trust him under any other circumstances, or beyond this—it is a matter of blind credulity, and at his own peril. No one ever imagined, that in any other case of agency to be transacted in a foreign country, the principal was bound beyond the instructions or authority given to his agent. It is every-day's experience to repudiate contracts and other transactions of agents in foreign countries, where they have exceeded the authority confided to them by their principals; and the authority confided by the principals is, in all such cases, measured by the interpretation and extent of that authority, by or according to the law of the place where it is given—by the lex loci, and not by the laws of a foreign country, of which the principal is, or may be wholly ignorant, and by whose regulations he is not bound. Any other rule would subject the principals to the most alarming responsibility, and be inconsistent with that just comity and public convenience, which lies at the foundation of international private law.   *   *   *

"If it should be said that the laws of the country where the master enters into a contract are to govern as to the validity, obligation and effect thereof, that may be true as to himself. But how can the laws of a foreign country clothe him with an authority to bind his owners, which the latter have never given him, or which the laws of the country, to which the ship belongs, have denied him to possess? The owners cannot, in such cases, be bound by foreign laws, to which they have never assented, and under which they do not live. The general rule of international law on this subject, for the repose and convenience of the whole world is, 'Statuta suis clauduntur territoriis, nec ultra territorium disperantur.'   *   *   *

"But when it is said (and it is most properly so said) that the law of a place where the contract is to be performed is to govern,

and not the place where the contract is entered into, we are to understand this rule of international law with all its proper qualifications and limitations. In the first place, the rule cannot prevail, or be obligatory, where the very contract, in the form in which it is made, although to be performed or executed in a foreign country, is pronounced invalid or void by the law of the country where it is made. Thus, for example, a contract entered into in Massachusetts, for a voyage to Africa, and from thence to a foreign market, for the purpose of carrying on the African slave trade—prohibited by our laws—would be illegal and void here, even if it were lawful and valid in Africa."

In Scudder v. Union National Bank, 91 U. S. 406, 412 (23 L. Ed. 245) it is laid down that "matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought."

In Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788, goods were shipped from New York to Liverpool by a steamship owned by a British corporation and which was registered at Liverpool. The bills of lading were issued at New York. They exempted the carrier from liability for stranding of the vessel and certain other perils even though arising from the negligence of the masters or others of the crew. The ship stranded and the court below found as a fact that those in charge of her navigation were negligent. It was contended at the argument that, as this contract was to be performed upon the high seas, it should be governed by the general maritime law. This the court answered by saying that it had not been shown that any such "general maritime law existed." It was also argued that, as the contract was to be chiefly performed on board of a British vessel and to be finally completed in Great Britain, and the damage occurred in that country, the contract was governed by English law, and by that law the clause exempting from liability for losses occasioned by negligence was valid. But to this the Supreme Court replied that the law of England had not been pleaded and proved, and that our courts did not take judicial notice of a foreign law unless pleaded and proven. "It

was therefore rightly held by the Circuit Court, upon the pleadings and proofs upon which the case had been argued, that the question whether the British law differed from our own was not open."

But it appeared in a supplemental record, certified to the Supreme Court, that in the court below the appellant moved, before the entry of the final decree, for leave to amend its answer by setting up the British law, and the motion had been denied. Upon that phase of the case the Supreme Court stated that, if justice required, it might order the case remanded, with directions to allow the answer to be amended and proof of the foreign law introduced. It thereupon proceeded to consider the effect of the proof offered if it were to be admitted. It stated its conclusion on page 458 (9 S. Ct. 478) as follows:

"This review of the principal cases demonstrates that according to the great preponderance, if not the uniform concurrence, of authority, the general rule that the nature, the obligation, and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country. There does not appear to us to be anything in either of the bills of lading in the present case tending to show that the contracting parties looked to the law of England, or to any other law than that of the place where the contract was made. * * * The contract being made at New York, the shipowner having a place of business there, and the shipper being an American, both parties must be presumed to have submitted themselves to the law there prevailing, and to have agreed to its action upon their contract. * * * The present case does not require us to determine what effect the courts of the United States should give to this contract, if it had expressly provided that any question arising under it should be governed by the law of England. * * *"

The Phenix Insurance Co. Case would be clearly decisive of the instant case, were it not for one fact. In that case, as we have seen, the court said that both parties must be presumed to have submitted themselves to the law of the place where the contract was

made, and had agreed that it should apply to the contract; and in that case, upon that principle, the American law controlled as the contract was made in New York. In the instant case the same presumption cannot be indulged; for the clause providing for exemption from liability for injuries arising from the negligence or default of the shipowners' servants expressly declares that "all questions arising under this paragraph of the contract shall be decided according to English law with reference to which it is made."

That the law of the place where the contract is to be performed governs seems to rest upon the reason that the parties cannot be presumed to have contemplated a law which would defeat their contract. See Phillimore, 4 Int. Law, 470, 471. And see Pritchard v. Norton, 106 U. S. 124, 137, 1 S. Ct. 102, 112 (27 L. Ed. 104), where the same explanation is given of the rule that the law of the place of performance governs and it is said that "it is upon this ground that the presumption rests, that the contract is to be performed at the place where it is made, and to be governed by its laws, there being nothing in its terms, or in the explanatory circumstances of its execution, inconsistent with that intention." The maxim is applicable, "ut res magis valeat, quam pereat."

In the instant case the question as to what law the parties intended is not left to presumption; for in their contract they have expressly provided that the contract is made with reference to English law, and that all questions relating to liability under paragraph 3 are to be decided according to that law. In the Kensington, 183 U. S. 263, 22 S. Ct. 102, 46 L. Ed. 190, the court had before it a ticket issued to a citizen of the United States, to be transported from Antwerp to New York. It contained on its face certain exemptions from liability for injuries to the passenger or his baggage from any act, neglect or default of the shipowner's servants. It also provided that "all questions arising hereunder are to be settled according to the Belgium law, with reference to which this contract is made," and proof was offered that the law of Belgium authorized the exemptions. The Supreme Court, discussing the matter, said:

"Where a contract is made in a foreign country, to be executed at least in part in the United States, the law of the foreign country, either by its own force or in virtue of the agreement of the contracting parties, must be enforced by the courts of the United States, even although to do so requires the

violation of the public policy of the United States. To state the proposition is, we think, to answer it. It is true, as a general rule, that the lex loci governs, and it is also true that the intention of the parties to a contract will be sought out and enforced. But both these elementary principles are subordinate to and qualified by the doctrine that neither by comity nor by the will of contracting parties can the public policy of a country be set at naught."

The court then referred to its decision in Liverpool & Great Western Steam Co. v. Phenix Insurance Co., supra, and said: "In the very nature of things, the premise, upon which this decision must rest, is controlling here, unless it be said that a contract, made in a foreign country, to be executed in part in the United States, is more potential to overthrow the public policy, enforced in the courts of the United States, than would be a similar contract, validly made, in one of the states of the Union. Nor is the suggestion that, because there is no statute expressly prohibiting such contracts, and because it is assumed no offense against morality is committed in making them, therefore they should be enforced, despite the settled rule of public policy to the contrary. The existence of the rule of public policy, not the ultimate causes upon which it may depend, is the criterion."

The Kensington Case seems to us decisive of the present case. As we understand the decision, the principle is that a contract made in a foreign country, and which is valid by its law, being assented to by all parties, will not be enforced in the United States, if its enforcement violates the public policy of the United States. The principle of lex loci contractus, and the other principle that the intention of the parties to a contract is to be ascertained and enforced, are subordinate to and qualified by the doctrine that "neither by comity nor by the will of the contracting parties can the public policy of a country be set at naught." In view of that doctrine, it is quite unimportant that the parties to this contract may have agreed expressly that the clause relating to exemptions should be governed by the law of England.

In Marine Insurance Co. v. McLanahan, 290 F. 685, policies of marine insurance were issued in London on an American ship. The Circuit Court of Appeals for the Fourth Circuit held that the policies, although issued in London by an English company, were "in all essentials to be governed by American law, and not by the laws of Great

Britain." In the opinion the court appears to have attached controlling importance to the fact that under the terms of the policies, "if there was a loss, it would be a loss of an American vessel, either within the territorial waters of the United States (as actually happened) or in waters closely adjacent thereto. The loss would be one in dollars, and would be payable to an American corporation, located in an American city. Under this state of facts, we hold that the terms of the policies must be construed by the laws of the United States and not by the laws of Great Britain, if they differ in any particular."

In Williston on Contracts, vol. 3, § 1792, the law is correctly stated as follows: "The legality of a contract depends upon the law of the place where it is made. If the contract was illegal (as distinguished from merely unenforceable) where made it is invalid everywhere, and if valid where made it is generally enforceable everywhere. That latter rule, however, is qualified by the doctrine that no state will enforce a contract though valid where made, if its enforcement is contrary to the policy of the forum."

In Wharton's Conflict of Laws (3d Ed.) vol. 2, § 471c, p. 1076, it is said that "it is, however, a well-established rule in the federal courts that a stipulation exempting the carrier from liability for loss or injury due to negligence is contrary to the public policy of the United States, and will not be enforced, even if valid by the law of the state or of a foreign country where the contract was made and the transportation commenced, or by the law which the contract expressly designates as the governing law. An exception has been made, however, where the loss or damage complained of occurred within the foreign state or country." The exception to the rule referred to is supported by The Trinacria (D. C.) 42 F. 863, and Baetjer v. La Compagnie (D. C.) 59 F. 789.

The decisions which support the exception were both rendered in the District Court for the Southern district of New York, one decided in 1890, and the other in 1894 by Judge Brown. In the Trinacria Case the bill of lading was issued at Genoa and provided for the carriage of goods in a British vessel to New York. It exempted from liability arising from negligence. The exception was valid both by English and Italian law. In sustaining the exception Judge Brown said: "As the contract was made in Italy by an English master of an English ship, and by an English bill of lading, the contract and the exceptions above referred to are valid as respects all acts done thereunder

within Italian territory. It is no part of the law or policy of this country to invalidate the contracts of parties lawfully made abroad, so far as respects performance there, or to apply our law to the consequences of such performance there, the acts being neither criminal, by our law, nor mala in se."

That case is clearly distinguishable from the instant case, inasmuch as in this case the contract of exemption, being made in the United States, was void by the law of the place where it was made. It affords no support for the principle contended for by the appellant herein. The Baetjer Case equally affords no support for the appellant. The contract in that case was made in France for the carriage of brandy from Havre to New York by a French vessel, and the exemption from negligence in the bill of lading was valid by the French law.

In Shearman & Redfield on Negligence (6th Ed.) vol. 2, § 505, p. 1365, after calling attention to conflicting decisions in the various states, and the English and Canadian rule, on the validity or invalidity of contract exemptions from liability for negligence, the law is stated as follows:

In the federal courts, and in Connecticut, Indiana, Wisconsin, Iowa, Missouri, Texas, Utah, Virginia, Michigan, Vermont and other states it is held that such a contract as to any degree of negligence is void, at least against a passenger giving any compensation for his journey, because it tends to cheapen human life, and to remove the most efficient guaranty which the common law has given to society against the destruction of its members by negligence. Our own judgment coincides with the latter decisions. The state has an interest of the highest degree in the preservation of its citizens' lives, and experience demonstrates that there is no practical safeguard against the destruction of those lives by negligence, except in private actions by the persons injured, or their representatives. The protection thus afforded to the individual is therefore of such value to the state that it should not allow it to be waived."

In O'Regan v. Cunard Steamship Co., 160 Mass. 356, 361, 35 N. E. 1070, 1071 (39 Am. St. Rep. 484), the court in a unanimous opinion, apparently concurred in by Judge Holmes, now of the Supreme Court of the United States, said: "Although the stipulation relieving the defendant from liability for injuries resulting from the negligence of its servants is against the policy of our law, it is not immoral or illegal, and it being val-

id in Great Britain, where it was made, it will be enforced on principles of comity by our courts."

The same doctrine was also unanimously asserted in that court in Fonseca v. Cunard Steamship, 153 Mass. 553, 557, 27 N. E. 665, 12 L. R. A. 340, 25 Am. St. Rep. 660, Judge Holmes concurring. See, also, Greenwood v. Curtis, 6 Mass. 358, 4 Am. Dec. 145; Forepaugh v. Delaware, Lackawanna & Western Railroad, 128 Pa. 217, 18 A. 503, 5 L. R. A. 508, 15 Am. St. Rep. 672. But these cases afford no support for the appellant herein. In those cases the exemption was valid at the place where the contract was made. In the instant case the contract of exemption was void at the place where it was made.

[8] An agreement made in this country, and which is contrary to public policy, no matter how solemnly it may have been made, is to that extent absolutely void and cannot be enforced. Teal v. Walker, 111 U. S. 242, 252, 4 S. Ct. 420, 28 L. Ed. 415. The contract herein involved was entered into in the United States by an American citizen. In so far as it relieves the defendant from its responsibility to the plaintiff for its own negligence, it is void and without effect, being contrary to the public policy of the country as declared again and again by the Supreme Court of the United States.

The judgment is affirmed.

HOUGH, Circuit Judge (dissenting). The only question in this case is whether the law of the contract of passage is the law of Great Britain. Every other matter discussed is in my opinion irrelevant. The court below repeatedly ruled that British law was wholly inapplicable, and this I consider plain and prejudicial error.

On reason, this case is a good example of how the rule usually summarized as that of lex loci contractus can be pushed to an absurdity. Plaintiff below made an agreement in Boston for carriage from Montreal to Liverpool; this court now holds that the law of such a contract is the law of Boston. By parity of reasoning, other passengers on the same vessel, between the same ports who arranged for passage in Peking or Timbuctoo, would have contracts governed by the laws of those cities, respectively. This seems to me the apex of unreason.

Nor does authority compel the result. The ruling cases are all to the effect that a contract is governed by the law with a view to which it was made. Wayman v. Southard, 10 Wheat. 1, 6 L. Ed. 253, early declared this, and Pritchard v. Norton, 106 U. S. 124, 1 S. Ct. 102, 27 L. Ed. 104, elaborated the doctrine in a manner often followed, long admired and especially approved in Liverpool, etc., Co. v. Phenix Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788. The contract at bar was plainly made solely with reference to transportation from one British port to another, and *therefore* with a view to British law; this is enough, but to clinch the matter the parties agreed that that law should exclusively apply.

The Kensington, 183 U. S. 263, 22 S. Ct. 102, 46 L. Ed. 190, I cannot accept as governing, or even relating to this case. It was there held that if a contract, though made in a foreign country, was to be performed even partially in the United States, any provision of that contract, violative of the public policy of the United States, would not be enforced by the courts of that country.

But no part of the contract at bar was to be performed in the United States, the major premise of The Kensington is here absent, so that the proposition here announced is, in substance, that all contracts formally concluded within the United States must be read, no matter what the words used, nor where the contract is to be performed, as if it must comply with our public policy, as ascertained by whatever court tries the case. This I think quite erroneous.