**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM MCMEIN EHART, Jr., Individually and as Personal Representative of the Estate of Maureen Anne Ehart, Deceased, | No. 22-16149 |
| | D.C. No. 1:21-cv-00475-SOM-KJM |
| *Plaintiff-Appellee*, | |
| v. | |
| LAHAINA DIVERS, INC.; CORY DAM, | |
| | OPINION |
| *Defendants-Appellants*, | |
| and | |
| KAITLIN MILLER; JULIANNE CRICCHIO; LAHAINA DIVE & SURF LLC, | |
| *Defendants*. | |

Appeal from the United States District Court
for the District of Hawaii
Susan O. Mollway, District Judge, Presiding

Argued and Submitted February 17, 2023
Honolulu, Hawaii

Filed February 8, 2024

Before:  Carlos T. Bea, Daniel P. Collins, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Collins

## SUMMARY[*]

### Admiralty Law

The panel reversed the district court's order granting plaintiff's motion to strike an affirmative defense of waiver or release and remanded for further proceedings in a wrongful death admiralty action.

Plaintiff's claims arose from his wife's death during a scuba and snorkeling tour from Lahaina Harbor to Molokini Crater, an atoll off the coast of Maui.  Before the tour, plaintiff and his wife each signed a waiver document releasing rights to sue defendants.  Defendants asserted waiver and release as an affirmative defense to claims based on simple negligence.  The district court struck the defense on the basis that the liability waivers were void under 46 U.S.C. § 30527(a), which prohibits certain liability waivers regarding "vessel[s] transporting passengers between ports

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

in the United States, or between a port in the United States and a port in a foreign country."

Citing *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002) (finding jurisdiction to review the district court's grant of partial summary judgment limiting the defendant's liability in accordance with a clause on the back of a cruise ship ticket), the panel held that it had jurisdiction to review the district court's interlocutory order under 28 U.S.C. § 1292(a)(3) because the order determined the rights and liabilities of parties in an admiralty case.

On the merits, the panel held that, under the plain meaning of "between ports in the United States," § 30527(a) does not apply to liability waivers as to vessels that transport passengers away from and back to a single port without stopping at any other port.

Dissenting, Judge Collins wrote that he would dismiss the appeal for lack of jurisdiction because the majority greatly expanded the court's already overbroad construction of 28 U.S.C. § 1292(a)(3). He would hold that *Wallis* is distinguishable because there, the district court imposed an across-the-board limitation on the defendants' liability. Judge Collins also disagreed with the majority's interpretation of 46 U.S.C. § 30527(a).

---

## COUNSEL

Ralph J. O'Neill (argued), Jamie C.S. Madriaga, and Matthew A. Hemme, MacDonald Rudy O'Neill & Yamauchi LLP, Honolulu, Hawaii, for Defendants-Appellants.

John R. Hillsman (argued), McGuinn Hillsman & Palefsky, San Francisco, California, for Plaintiff-Appellee.

Mark M. Williams, Law Office of Mark M. Williams, Pasadena, California, for Amicus Curiae Daniel W. Bader, dba Sea Landing Dive Center.

Brian O. Felder, Wilson Elser Moskowitz Edelman & Dicker LLP, Los Angeles, California, for Amicus Curiae Marine Recreation Association.

Charles D. Naylor, Law Offices of Charles D. Naylor, Long Beach, California; Michael F. Sturley, University of Texas Law School, Austin, Texas; Michael A. Kelly, Richard H. Schoenberger, Matthew D. Davis, Spencer J. Pahlke, and Joseph Nicholson, Walkup Melodia Kelly & Schoenberger PC, San Francisco, California; Gretchen M. Nelson and Carlos F. Llinas Negret, Nelson & Fraenkel LLP, Los Angeles, California; Douglas T. Moore, The Law Offices of Douglas Thomas Moore LLC, Honolulu, Hawaii; Preston Easley, Law Offices of Preston Easley APC, San Pedro, California; Joseph S. Stacey, James P. Jacobsen, and Nigel T. Stacey, Stacey & Jacobsen LLP, Seattle, Washington; Lyle C. Cavin, Jr., Law Offices of Lyle C. Cavin, Jr. & Associates, Oakland, California; Daniel C. Dziuba, Tichenor Dziuba Law Office, Portland, Oregon; Kurt Micklow and Edward M. Bull, III, Brodsky Micklow Bull & Weiss LLP, Oakland, California; Joel Krissman, Krissman & Silver LLP, Long Beach, California; for Amici Curiae Injured Vessel Passengers and Surviving Family Members and Personal Representatives of Fatally Injured Vessel Passengers.

**OPINION**

BEA, Circuit Judge:

The question in this case is whether 46 U.S.C. § 30527(a),[1] which prohibits certain liability waivers regarding "vessel[s] transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country," applies when a vessel transports passengers away from and back to a *single* port in the United States without stopping at any other port. We hold that it does not. The plain meaning of "between ports in the United States" is *between at least two separate ports in the United States*, and § 30527(a) therefore does not apply to liability waivers as to vessels that transport passengers away from and back to a single port without stopping at any other port.

## I.  BACKGROUND[2]

On September 14, 2021, Maureen Anne Ehart and her husband, William McMein Ehart, Jr., went on a chartered scuba and snorkeling tour to Molokini Crater. Molokini Crater is a crescent-shaped volcanic atoll located about 2.5 miles off the south coast of Maui, Hawaii. The Eharts boarded the *Dauntless*—a boat owned by Lahaina Divers,

---

[1] At the time of the relevant events and the time this case was filed, this statute was codified as 46 U.S.C. § 30509. As of December 23, 2022, the statute has moved to 46 U.S.C. § 30527. This opinion uses the updated citation. Other than the citation, the statute has not changed.

[2] Except where otherwise indicated, these facts are taken from the pleadings and are accepted as true. *See Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 n.2 (9th Cir. 1992); *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).

Inc.—at Lahaina Harbor and traveled on the boat to Molokini Crater along with 14 other paying passengers and a three-person crew. The crew included the master of the *Dauntless*, Cory Dam, and two scuba instructors, Kaitlin Miller and Julianne Cricchio.

Prior to the excursion, the Eharts had each signed a separate waiver document, which stated: "THIS IS A RELEASE OF YOUR RIGHTS TO SUE LAHAINA DIVE & SURF, LLC, AND/OR LAHA[I]NA DIVERS INC. (LDS/LDI), AND ITS OWNERS, EMPLOYEES, AGENTS AND ASSIGNS FOR PERSONAL INJURIES OR WRONGFUL DEATH THAT MAY [OCCUR] DURING THE FORTHCOMING DIVE ACTIVITY AS A RESULT OF THE INHER[ENT ]RISKS ASSOCIATED WITH SCUBA DIVING AND/OR SNORKE[LI]NG OR AS A RESULT OF NEGLIGENCE." The waiver then instructed participants to check boxes. Maureen Ehart checked the following boxes (William Ehart checked all of the boxes):

(Check off each of the following sections as you read them. If you do not scuba dive, check only those items marked by the * symbol.) *

☐   1. I acknowledge that I am a certified diver trained in safe diving practices

☑   * 2. I am aware of the risks inherent in this scuba diving and/or snorkeling and I accept these risks

☐   3. I affirm that I am in good mental and physical fitness for diving, and that I am not under the influence of alcohol, nor am I under the influence of drugs that are contraindicatory to scuba diving. If I am taking medication, I affirm that I have seen a physician and have approval to scuba dive while under the influence of the medication/drugs

☐   4. I am aware of the dangers of breath holding white scuba diving, and will not hold LDS/LDI and related entities (such as employees, instructors, certified assistants, boat operators, or diver agencies) responsible if I am injured doing so.

☐   5. I am aware that I will be expected to scuba dive with a buddy, and it will be our responsibility to plan a dive allowing for our diving limitations and the prevailing water conditions. I will not hold the above listed businesses or individuals responsible for my failure to safely plan my dive.

☐   * 6. I will inspect all of my equipment prior to the activity and will notify the above listed businesses and/or individuals if any of my equipment is not working properly. I will not hold the above listed businesses or individuals responsible for my failure to inspect my equipment prior to scuba diving or snorkeling.

☑   * 7. I acknowledge that I am physically fit to scuba dive and/or snorkel. and I will not hold the above listed businesses or individuals responsible if I am injured as a result of heart, lung, ear, or circulatory problems or other illnesses that occur while scuba diving and/or snorkeling.

☑   8. I understand that even though I follow all of the appropriate dive practices. there is still some risk of my sustaining decompression sickness, embolism or other hyperbaric injuries, and I expressly assume the risk of said injuries.

☑   9. I also expressly assume the risk and accept the responsibility to plan my scuba dive and dive my plan.

☑   * 10. I also understand that scuba diving and/or snorkeling are physically strenuous activities and that I will be exerting myself during this diving excursion, and then if I am injured as a result of heart attack, panic, hyperventilation, etc., that I expressly assume the risk of said injuries and that I will not hold the above listed businesses or individuals responsible for the same.

☑   * 11. I also understand that on this open-water diving trip, I will be at a remote site and that there will not be immediate medical care or hyperbaric care available to me, and I expressly assume the risk of diving in such a remote spot.

☑   * 12. IT IS MY INTENTION BY THIS INSTRUMENT TO EXEMPT. RELEASE AND HOLD HARMLESS LDS/LDI AND ALL RELATED ENTITIES AS DEFINED ABOVE FROM ALL LIABILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE. AND WRONGFUL DEATH CAUSED BY NEGLIGENCE.

**I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS INFORMATION AND RELEASE BY READING IT BEFORE I SIGNED IT ON BEHALF OF MYSELF AND MY HEIRS.**

Below the questionnaire, the Eharts each again signed the waiver.[3]

The *Dauntless* traveled across the water from Lahaina Harbor to Molokini Crater, where it tied up to a mooring buoy. At Molokini Crater, the scuba instructors (Miller and Cricchio) escorted two groups of divers on separate scuba tours. Instead of joining the scuba tour members, Maureen Ehart and two other passengers snorkeled separately from the scuba tours in the waters of the Crater. Dam remained on the *Dauntless* to maintain an anchor watch, serve as a lookout, monitor the weather, supervise the passengers' snorkeling activities, and act as a lifeguard, among other duties.

The winds, waves, and currents inside the Crater increased, and the two other snorkelers who had gone with Maureen returned to the *Dauntless*, while Maureen stayed in the water. Dam, preoccupied by other duties, "lost track of [Maureen] and permitted her to drift away unsupervised and unseen." When Dam realized he had lost sight of Maureen, he did not recall the scuba tour members, call the Coast Guard, or conduct an immediate search; instead, he waited for both scuba tours to return to the boat and then ordered Miller and Cricchio to search for Maureen. This search, which lasted approximately 30 minutes, was "poorly planned, improperly equipped, and ultimately unsuccessful." Dam eventually called for assistance from the Coast Guard and local authorities. The Coast Guard and

---

[3] The waiver language and questionnaire are taken from an exhibition attached to the Plaintiff's concise statement of facts in support of the motion to strike. The parties do not dispute the accuracy of the waiver language or questionnaire.

Maui County Emergency Services searched for Maureen for three days, but she was never found.

Plaintiff filed an action under admiralty jurisdiction in the District of Hawaii asserting six causes of action against Lahaina Divers and Dam ("Defendants")[4]: (1) a wrongful death claim based on gross negligence; (2) a wrongful death claim based on simple negligence; (3) a survival claim based on gross negligence; (4) a survival claim based on simple negligence; (5) a reckless infliction of emotional distress claim; and (6) a negligent infliction of emotional distress claim.

In their Answer to the Complaint, Defendants asserted waiver and release as an affirmative defense.[5] Plaintiff moved to strike the defense, arguing that the liability waiver signed by the Eharts was void under 46 U.S.C. § 30527(a) and Hawaii Revised Statute ("HRS") § 663–1.54. Defendants opposed the motion on the grounds that (1) 46 U.S.C. § 30527(a) does not apply here because the *Dauntless* was not "transporting passengers between ports in the United States, or between a port in the United States and a port in a

---

[4] Plaintiff also brought the following claims against Miller and Cricchio: (1) a wrongful death claim based on simple negligence; (2) a survival claim based on simple negligence; and (3) a negligent infliction of emotional distress claim. However, Miller and Cricchio did not raise the affirmative defense of waiver and release and are not parties to the present appeal.

[5] In their Answer to the Complaint, Defendants appeared to raise the affirmative defense of waiver and release against all six causes of action (including those based on gross negligence). But in their Opening Brief on appeal, Defendants appeared to acknowledge that the waiver pertained only to simple negligence, not gross negligence.

foreign country"; and (2) federal admiralty law precludes application of the Hawaii state statute in this case.

The district court granted Plaintiff's motion to strike the affirmative defense on the basis that the liability waivers signed by the Eharts were void under § 30527(a). In its decision granting the motion to strike, the district court held that 46 U.S.C. § 30527(a) applies to the *Dauntless* because the *Dauntless* was conveying passengers from Lahaina Harbor to Molokini Crater and back. The district court did not make a determination as to whether Molokini Crater is a "port." Instead, it reasoned that § 30527(a) applies "not only to the transportation of passengers between Port A and a different port but also to the transportation of passengers from Port A . . . on an excursion that returns to Port A even if there is no intervening different port." Because the *Dauntless* transported passengers away from and back to Lahaina Harbor—which the parties do not dispute is a "port"—the district court concluded that § 30527(a) applies to the *Dauntless* and renders the liability waivers void. The district court then explained that the Hawaii statute does not provide an alternate basis to strike the affirmative defense because there remains a question of fact as to whether the liability waiver was inapplicable under the Hawaii statute.[6]

Defendants sought reconsideration of the district court's order to strike the affirmative defense or, in the alternative,

---

[6] The Hawaii statute provides that liability waivers regarding recreational activities will not be valid unless the owner or operator of the activity: (1) provides full disclosure of the inherent risks of the activity; and (2) takes reasonable steps to ensure that the patron is physically able to participate in the activity and is given the necessary instructions to participate safely. Haw. Rev. Stat. § 663–1.54. The district court held that there was a question of fact as to whether each of these conditions was satisfied.

to have the court certify an interlocutory appeal with respect to the striking of that defense. The district court denied the motion and declined to certify the interlocutory appeal. Defendants then filed this interlocutory appeal.

## II.   STANDARD OF REVIEW

We review questions of statutory interpretation de novo. *United States v. Doe*, 136 F.3d 631, 634 (9th Cir. 1998). We review a district court's ruling on a motion to strike for abuse of discretion. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003). We review de novo a district court's holding as to whether an affirmative defense is applicable as a matter of law. *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008).

## III.   JURISDICTION

The district court declined to certify an interlocutory appeal under 28 U.S.C. § 1292(b).[7] However, this court has jurisdiction over the interlocutory appeal under 28 U.S.C. § 1292(a)(3). Under 28 U.S.C. § 1292(a)(3), a court of appeals has jurisdiction over "[i]nterlocutory decrees of . . . district courts . . . determining the rights and liabilities of the parties to the admiralty cases in which appeals from final decrees are allowed." This court has previously exercised jurisdiction under § 1292(a)(3) in interlocutory appeals to review the enforceability of an affirmative defense based on the existence of a maritime contract limiting liability. *See Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832–34 (9th Cir. 2002) (finding jurisdiction to

---

[7] "Section 1292(b) provides a mechanism by which litigants can bring an immediate appeal of a non-final order upon the consent of both the district court and the court of appeals." *In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1025–26 (9th Cir. 1981).

review the district court's grant of partial summary judgment limiting the defendant's liability in accordance with a clause on the back of a cruise ship ticket); *Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165, 1168 (9th Cir. 1998) (finding jurisdiction to review the district court's grant of partial summary judgment limiting the defendant's liability pursuant to the Carriage of Goods at Sea Act); *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir. 1989) (same). Because this court "ha[s] jurisdiction over an interlocutory appeal under § 1292(a)(3) where, as here, only the validity and applicability of a provision limiting liability has been determined," this court has jurisdiction over the present interlocutory appeal.[8] *Wallis*, 306 F.3d at 834.

---

[8] The dissent characterizes our exercise of jurisdiction in this case as an expansion of *Wallis*. To distinguish *Wallis* from this case, the dissent emphasizes that the liability waiver at issue here does not cover Plaintiff's gross negligence claims, whereas the liability waiver in *Wallis* pertained to the plaintiff's only claim that survived the defendants' motion for summary judgment, the plaintiff's Death on the High Seas Act ("DOSHA") claim. But we do not see a meaningful difference between this case and *Wallis*. In *Wallis*, this court exercised appellate jurisdiction under § 1292(a)(3) where the district court had "only decided that, if Princess [the defendant] were liable, its liability would be limited pursuant to the contract" at issue. *Wallis*, 306 F.3d at 833. The dissent argues this limitation was an "across-the-board" cap. *See* Diss. Op. at 34. But surely the panel in *Wallis*, which was decided in 2002, did not think such a provision could be an absolute, across-the-board limit on liability, when this Circuit had recently held that "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence." *See Royal Ins. Co. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999). On appeal, the effect of the *Wallis* panel's exercise of jurisdiction to review a contractual liability limitation was to determine "what [the plaintiff would] have to prove to recover" beyond the contract's liability limitation. *See* Diss. Op. at 35 (emphasis

## IV.   46 U.S.C. § 30527

46 U.S.C. § 30527(a) is a section of the Shipowner's Limitation of Liability Act ("the Act") that prohibits certain contractual provisions limiting liability for personal injury or death. Section 30527(a) provides:

> **(a) Prohibition.**--
>
> > **(1) In general.**--The owner, master, manager, or agent of *a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country*, may not include in a regulation or contract a provision limiting--
> >
> > > **(A)** the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or
> > >
> > > **(B)** the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

removed). The same is true here: if the liability waiver applies, then Plaintiff would need to prove that Defendants were grossly negligent to recover; if the liability waiver is prohibited by statute, then Plaintiff need only prove that Defendants were negligent. The dissent agrees that "we reaffirmed in *Wallis* that an order determining 'the validity and applicability of a provision *limiting* liability' counts as a 'decree[] . . . determining the rights and liabilities of the parties' within the meaning of § 1292(a)(3)." Diss. Op. at 31 (alterations and emphasis in original) (citing *Wallis*, 306 F.3d at 834). That is what the district court's order determined in this case. We see no meaningful distinction between the posture of this case and *Wallis*. Hence, we are bound by *Wallis* and have appellate jurisdiction.

> **(2) Voidness.**--A provision described in paragraph (1) is void.

46 U.S.C. § 30527(a) (emphasis added). The question before us is whether § 30527(a) applies where a vessel departs from and returns to a single port in the United States without stopping at any other port. We hold that the language "between ports in the United States" requires transport between *at least two* ports in the United States.

A statute's language is the starting point for its interpretation. *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987). "When a statute does not define a term, we typically 'give the phrase its ordinary meaning.'" *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010)). "To determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is permissible." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). 46 U.S.C. § 30527 does not define the term "transporting passengers between ports," nor is it a term of art with a particular legal definition, *see Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017), so we apply the term's plain meaning.

The plain meaning of the term "transporting passengers between ports" is transporting passengers from one port to another port (Port A to Port B), not transporting passengers away from and back to a single port (Port A to Port A). This meaning stems from the combination of the word "between" and the plural form of "ports." The use of the plural "ports" is not determinative on its own because "[i]n determining the meaning of any Act of Congress, *unless the context indicates otherwise*-- . . . words importing the plural include the singular." 1 U.S.C. § 1 (emphasis added). But here, the word

"between" suggests that the plural "ports" does not include the singular "port." *See Witkowski v. Niagara Jet Adventures, LLC*, 2020 WL 486876, at *4 n.4 (W.D.N.Y. Jan. 30, 2020) (reasoning that, in § 30527, "the word 'between' . . . necessarily provides context that the plural cannot include the singular."). Further, the use of the word "ports" when referring to ports in the United States and "port" when referring to a port in the United States and a port in a foreign country in the same sentence of the Act imports the meaning that "ports" is not used to denote the singular under 1 U.S.C. § 1. *See* ANTONIN SCALIA & BRYAN A. GARNER, *Presumption of Consistent Usage*, *in* READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012).

In holding otherwise, the district court relied on three dictionary definitions of the word "between": (1) "[i]n or through the position or interval separating";[9] (2) [c]onnecting spatially";[10] and (3) "in the time, space, or interval that separates."[11] The district court appears to have handpicked these definitions from the eight definitions of "between" in the American Heritage Dictionary and the eleven definitions in the Merriam-Webster Dictionary

---

[9] E.g., "between the trees" or "between 11 o'clock and 12 o'clock." *Between*, THE AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=between [https://perma.cc/45AZ-WV7D]. Notice: there is more than one tree or one hour.

[10] E.g., "a railroad between the two cities." *Between*, THE AMERICAN HERITAGE DICTIONARY. Notice: there are two cities.

[11] E.g., "the alley *between* the butcher shop and the pharmacy" or "should arrive *between* 9 and 10 o'clock." *Between*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/between [https://perma.cc/8HJL-9KDG] (emphasis in original). Notice: there are two shops and two times.

without explanation. But even these definitions, and their corresponding examples, nonetheless support a holding that the phrase "between ports" refers to multiple ports. Each of these definitions involves a relationship between one thing and something else. Put more simply, the word "between" implies more than one.

Of the eleven definitions of "between" found in the Merriam-Webster Dictionary, the definition that best fits the context of § 30527(a) is "from one to another of,"[12] for example, "air service *between* Miami and Chicago." *Between*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/between [https://perma.cc/8HJL-9KDG] (emphasis in original). This definition demonstrates that, in the transportation context, the word "between" necessarily implies at least two locations. *See* ANTONIN SCALIA & BRYAN A. GARNER, *Ordinary-Meaning Canon*, *in* READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012) ("Most common English words have a number of dictionary definitions . . . . One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

The district court attempted to avoid this conclusion by reasoning that "[h]ad Congress intended to require different ports when it used the word 'ports,' it could have easily

---

[12] The other definitions are as follows: (1) "by the common action of : jointly engaging"; (2) "in common to : shared by"; (3) "in the time, space or interval that separates"; (4) "in intermediate relation to"; (5) "serving to connect or unite in a relationship (such as difference, likeness, or proportion)"; (6) "setting apart"; (7) "in preference for one or the other of"; (8) "in point of comparison of"; (9) "in confidence restricted to"; and (10) "taking together the combined effect of." *Between*, MERRIAM-WEBSTER DICTIONARY.

indicated that by using the phrase 'between different ports.'" This argument fails because, as discussed, the word "between" indicates that Congress intended to reference multiple ports. Multiple ports are, by definition, different one from the other; adding "different" would be tautological. *See* ANTONIN SCALIA & BRYAN A. GARNER, *Surplusage Canon*, *in* READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("[No word] should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

The district court next attempted to skirt the plain meaning of the phrase "between ports" by reasoning that limiting the statute's application to vessels transporting passengers between *different* ports would result in "absurd results." The district court reasoned:

> [A]pplying "ports" only when journeys are between Port A and Port B leads to odd and absurd results. For example, a vessel may take passengers a few hundred yards from one side of a river to the other (Port A to Port B). Waivers of negligence for the short journey between Port A and Port B would be prohibited by § 305[27], as the journey would involve transportation of passengers "between ports of the United States." However, if the same vessel left Port A for a 10-hour sightseeing tour and then returned to the same port (Port A), then, under Defendants' argument, waivers of negligence for such a journey would not be prohibited by § 305[27]. It makes little sense to think that Congress intended to prohibit a waiver only

for the first (very brief) journey. Both involve the transportation of passengers between ports. In the latter example, the vessel is conveying the passengers from one port out for a boat tour and then back to the same port, with the tour being the interval between embarkation and disembarkation at the same port.

We reject this reasoning for two reasons. First, both examples do not "involve the transportation of passengers between ports." The vessel that departs from Port A and returns to Port A might involve the transportation between a port and *the water,* but it does not involve the transportation of passengers between ports (plural). Second, nothing in the text of the statute indicates that its applicability is tied to the length of the journey, but the phrase "between ports" does indicate that the statute's applicability is dependent on the transportation of passengers between different ports.[13]

---

[13] The district court also cited the *General Slocum* disaster as a reason to believe that Congress intended that § 30527(a) apply to vessels that depart from and return to the same port. The *General Slocum* was a steamship that caught fire in New York Harbor in 1904, resulting in the death of 957 of its 1,388 passengers and crew members. LAWRENCE O. MURRAY ET AL., U.S. DEP'T COM. & LAB., REPORT OF THE UNITED STATES COMMISSION OF THE INVESTIGATION UPON THE DISASTER TO THE STEAMER "GENERAL SLOCUM" 25 (1904). The district court observed that the *General Slocum* disaster was discussed during testimony before Congress during the hearings regarding the predecessor to 46 U.S.C. § 30527. The district court reasoned that the *General Slocum* was chartered to take passengers from the harbor to a picnic area and back to the harbor, and "[t]hus, in enacting [the predecessor to § 30527], Congress was well aware of vessels taking passengers on day trips to and from the same port."

In summary, we conclude that the plain language of § 30527 limits its application to vessels transporting passengers *between at least two ports* and does not apply to vessels transporting passengers away from and back to a single port. Because the *Dauntless* was not transporting passengers between two ports, but away from and back to a single port (Lahaina Harbor), § 30527 does not apply.[14]

---

Because the meaning of the statute is clear from its text, the district court's review of the legislative history was unnecessary and improper. *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017). But even were the legislative history a suitable basis for statutory interpretation, the district court's reasoning misses the mark. The *General Slocum* may have planned to depart from and return to the same port, but it also planned to stop at another port along the way. According to the record, the steamship was chartered to transport passengers between its origin port on Manhattan to a picnic ground with its own pier on Long Island (from which pier the passengers would depart), and later back to the origin port. Thus, the *General Slocum*'s intended route was from Port A (Manhattan) to Port B (Long Island) to Port A, not merely from Port A to Port A.

[14] Plaintiff asserts in conclusory terms that Molokini Crater is a "port." We disagree as a matter of law. The ordinary meaning of the word "port" is a place where vessels may load or unload cargo or passengers from or onto *land*—not a mooring buoy where passengers can depart from the ship into *water*. *See Port*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/port [https://perma.cc/BD46-NXJR]; *Port*, COLLINS DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/port (last visited Jan. 18, 2024); *Port*, NATIONAL GEOGRAPHIC, https://education.nationalgeographic.org/resource/port/ [https://perma.cc/EV8T-BGW8]; *Port*, AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=port [https://perma.cc/HUW2-5SAW]; *Port*, BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/port [https://perma.cc/8498-5Q85]. And "port" is not a term of art with "a particular meaning in legal parlance" such that the court should depart from the ordinary usage of

### V.    HAWAII REVISED STATUTE § 663–1.54

Plaintiff argues that the liability waiver signed by the Eharts is void under HRS § 663–1.54 and that Hawaii state law thus provides an alternate basis to affirm the district court's decision striking the affirmative defense of waiver. HRS § 663–1.54 states:

> [O]wners and operators of recreational activities shall not be liable for damages for injuries to a patron resulting from inherent risks associated with the recreational activity if the patron participating in the recreational activity voluntarily signs a written release waiving the owner or operator's liability for damages for injuries resulting from the inherent risks. No waiver shall be valid unless:
>
> (1) The owner or operator first provides full disclosure of the inherent risks associated with the recreational activity; and
>
> (2) The owner or operator takes reasonable steps to ensure that each patron is physically able to participate in the activity and is given the necessary instruction to participate in the activity safely.

HRS § 663–1.54(b). The district court held that it is unclear based on the pleadings and present record whether

---

the word. *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017) (quoting *United States v. Guerrerio*, 675 F. Supp. 1430, 1438 (S.D.N.Y. 1987), in explanatory parenthetical).

conditions of the statute were satisfied, including whether Defendants provided "full disclosure of the inherent risks" of snorkeling, whether Defendants took "reasonable steps to ensure that [Maureen] was physically able to participate in the activity," and whether Maureen was "given the necessary instruction to participate in the activity safely."

Plaintiff forfeited any argument that the district court erred in finding that there was a question of fact as to whether the conditions of the statute were satisfied because Plaintiff failed to raise this issue in the answering brief. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). Thus, on this record, HRS § 663–1.54 does not provide an alternate basis for upholding the district court's decision striking the affirmative defense of waiver.[15]

## VI. CONCLUSION

For the reasons stated above, we reverse the district court's order granting Plaintiff's motion to strike the affirmative defense of waiver or release, and we remand for further proceedings.

**REVERSED AND REMANDED.**

---

[15] Defendants argue that HRS § 663–1.54 conflicts with federal admiralty law and is therefore preempted in this context. While Defendants raise a substantial question about federal preemption, we need not resolve it here given that the district court found that there is a question of fact whether the conditions of the Hawaii statute were met. The district court did not address the preemption issue and the parties provided only cursory arguments in their briefs. Thus, we decline to exercise our discretion to resolve the issue now.

COLLINS, Circuit Judge, dissenting:

In asserting jurisdiction over this interlocutory appeal from an order striking an affirmative defense from an answer, the majority greatly expands this circuit's already overbroad construction of 28 U.S.C. § 1292(a)(3)'s narrow grant of interlocutory appellate jurisdiction in admiralty cases. That construction has been rejected by at least four other circuits, but the majority nonetheless erroneously extends it in ways that even our prior decisions cannot justify. Having thus improperly asserted jurisdiction that we do not have, the majority then erroneously resolves an important question of law by holding that Congress's prohibition of liability waivers for passenger-carrying vessels, *see* 46 U.S.C. § 30527, does not apply to day-trip excursions that start and end at the same port without visiting another port. Because all of this is wrong, I respectfully dissent.

# I

Plaintiff William Ehart ("Plaintiff" or "William"), his wife Maureen, and "fourteen other paying passengers" set out from Maui's Lahaina harbor aboard the "dive boat" *Dauntless* early on the morning of September 14, 2021 for a "dive tour."[1] The *Dauntless* is owned by Defendant Lahaina

---

[1] Because this case arises on a motion to strike an affirmative defense as "insufficient" under Federal Rule of Civil Procedure 12(f), we must take the facts as alleged by the non-moving party—here, the Defendants—as true for purposes of evaluating the adequacy of the challenged defense. *See Rev Op Grp. v. ML Manager LLC* (*In re Mortgages Ltd.*), 771 F.3d 623, 630–32 (9th Cir. 2014) (holding that, in evaluating whether denials in an answer "were a sufficient defense" under Rule 12(f), the "factual allegations" contained in those denials "must be presumed to be true"). Accordingly, I take as true the version of facts reflected in Defendants'

Divers, Inc. ("Lahaina Divers"). However, the boat was chartered by a separate entity, Lahaina Dive and Surf, LLC ("Lahaina Dive & Surf"), which is also the entity that operated the dive tour and employed the crew.[2] The crew included the captain, Defendant Cory Dam, as well as two "open-water-scuba instructor[s]" certified by the Professional Association of Diving Instructors, namely, Defendants Kaitlin Miller and Julianne Cricchio.

Dam guided the *Dauntless* to the "Molokini Crater, a crescent-shaped islet in the ocean off the southeast coast of Maui." However, the vessel was not tied directly to the crater or to any structure attached to the crater; instead, Dam tied the boat "to a mooring buoy known as 'Reef's End' at the Crater." At that point, Miller and Cricchio led two groups of passengers, including William, into the water for their separate scuba excursions. After they did so, several remaining passengers, including Maureen, went into the water in order to snorkel. At that time, Dam "was the sole crew member aboard to maintain a lookout, . . . oversee the snorkeling activities, recall the divers and snorkelers if necessary, and provide rescue if necessary." The complaint alleges that, after the other snorkelers got back in the boat,

---

paragraph-by-paragraph answer responding to the factual allegations of the original complaint. Although an amended complaint and answer were filed after the district court's ruling that is challenged in this interlocutory appeal, the allegations that we must take as true have not been materially altered by those filings, except to correct (in accordance with Defendants' answer) the names of two of the crew members named as Defendants. Those subsequent filings are therefore of no consequence to this appeal.

[2] Lahaina Dive & Surf has been added as an additional Defendant in the subsequently filed amended complaint, but it is not a party to this interlocutory appeal.

Maureen stayed in the water alone and ultimately drifted away in the current unnoticed. The two scuba groups returned of their own accord, and at no point did Dam "recall the scuba divers or snorkelers." After Maureen's disappearance was finally noticed, Miller and Cricchio swam in the area in an unsuccessful effort to locate her. Dam also sought assistance on the emergency marine radio channel, and the Coast Guard and Maui County responders used "various resources" in a fruitless attempt to locate Maureen. Maureen was never found and is presumed dead. The *Dauntless* returned to Lahaina with its remaining passengers.

Invoking the district court's maritime jurisdiction under 28 U.S.C. § 1333, William brought this suit on behalf of himself and his wife's estate, naming as Defendants Lahaina Divers, Dam, Miller, and Cricchio. Invoking theories of negligence and gross negligence, the complaint alleged claims for wrongful death, claims for "survival damages" for the injuries Maureen experienced before her death, and claims for William's emotional distress. In answering the complaint, Defendants Lahaina Divers and Dam (hereafter "Defendants") asserted, as an affirmative defense, that William and Maureen had "waived and released the claims" asserted. As further elaborated in connection with Plaintiff's subsequent motion to strike this affirmative defense, the defense was based on written waivers that William and Maureen had each signed before boarding the *Dauntless*. The relevant language in those releases stated, *inter alia*, that the signatory intended to "exempt, release and hold harmless" Lahaina Divers, Lahaina Dive & Surf, and related entities and agents "from all liability whatsoever for personal injury, property damage, and wrongful death caused by negligence."

In moving to strike this affirmative defense of waiver and release, Plaintiff contended, *inter alia*, that the waivers were void under what is now § 30527 of title 46 of the United States Code.[3]  That statute provides:

(a) Prohibition.—

(1) In general.—The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting—

(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or

(B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

(2) Voidness.—A provision described in paragraph (1) is void.

---

[3] At the time of the relevant district court proceedings, this provision was contained in § 30509 of title 46.  However, in December 2022, Congress redesignated § 30509 as § 30527.  *See* Pub. L. No. 117-263, § 11503(a)(3), 136 Stat. 2395, 4130 (Dec. 23, 2022).  Prior to the enactment of title 46 as positive law in 2006, the predecessor provision to § 30509 was contained in § 4283B of the Revised Statutes and was classified to § 183c of the unenacted version of title 46.  The underlying prohibition on liability waivers was first enacted as § 4283B in 1936. *See* Ch. 521, § 2, 49 Stat. 1479, 1480 (June 5, 1936).

46 U.S.C. § 30527(a).  Concluding that the written waivers signed by Plaintiff and Maureen were covered by § 30527(a)(1), the district court on May 10, 2022 held that the waivers were void under § 30527(a)(2).  Accordingly, the court granted Plaintiff's motion to strike Defendants' defense of waiver and release.

Defendants timely filed a motion for reconsideration of the district court's order, and in that motion they also asked, in the alternative, that the district court certify that order for immediate interlocutory appeal under 28 U.S.C. § 1292(b). The district court denied the motion.  Contending that the order granting the motion to strike was nonetheless immediately appealable as of right under 28 U.S.C. § 1292(a)(3), Defendants filed a timely notice of appeal.

## II

In my view, we lack interlocutory jurisdiction over this appeal, and I therefore would dismiss it without reaching the merits.

## A

"From the very foundation of our judicial system, the general rule has been that the whole case and every matter in controversy in it must be decided in a single appeal." *Microsoft Corp. v. Baker*, 582 U.S. 23, 36 (2017) (simplified).  Under this "general rule," that "single appeal" is "to be deferred until final judgment has been entered," at which time "claims of district court error at any stage of the litigation may be ventilated." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994).  This "final-judgment rule," now codified in 28 U.S.C. § 1291, is based on the recognition that "[p]ermitting piecemeal, prejudgment appeals . . . undermines 'efficient judicial

administration' and encroaches upon the prerogatives of district court judges, who play a 'special role' in managing ongoing litigation." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (citations omitted).

Congress, however, has recognized several statutory exceptions to that general rule by expressly "authoriz[ing] review of certain interlocutory decisions" in the various provisions of 28 U.S.C. § 1292. *Baker*, 582 U.S. at 27 n.1. After unsuccessfully attempting to persuade the district court to invoke one of those exceptions—namely, § 1292(b)'s discretionary authority to allow interlocutory appeals of orders resolving certain "controlling question[s] of law"— Defendants asserted that they could take an immediate appeal as of right under a different subsection of § 1292. Specifically, Defendants invoked subsection (a)(3) of that statute, which authorizes appeals of:

> (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a)(3). Accordingly, whether we have jurisdiction over this appeal turns dispositively on whether the district court's order striking the affirmative defense counts as an "[i]nterlocutory decree[] . . . determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." *Id*. There is no question that this is an "admiralty case[]," nor is there any doubt that this is a case in which, when a final decree is entered, an "appeal[] from [that] final decree[] [is] allowed." *Id*. There is likewise no dispute that the district court's order

here is "[i]nterlocutory." *Id*. The only question, then, is whether it counts as a "decree[] . . . determining the rights and liabilities of the parties." *Id*.

This distinctive phrase traces back verbatim to the enactment of the predecessor to § 1292(a)(3) in 1926. *See* Ch. 102, 44 Stat. 233 (Apr. 3, 1926) (adding, to § 129 of the Judicial Code, language stating that "[i]n all cases where an appeal from a final decree in admiralty to the circuit court of appeals is allowed an appeal may also be taken to said court from an interlocutory decree in admiralty determining the rights and liabilities of the parties"). In explaining the primary purpose of the provision, we have stated:

> It was a common practice for the admiralty court to determine first the issue of liability and, if it found liability, to refer the parties to a commissioner for the determination of damages. The purpose of § 1292(a)(3) was to permit a party found liable to take an immediate appeal from that finding and thereby possibly avoid an oftentimes costly and protracted trial of the damages issue.

*Seattle First Nat'l Bank v. Bluewater P'ship*, 772 F.2d 565, 568 (9th Cir. 1985) (quoting 9 MOORE'S FEDERAL PRACTICE ¶ 110.19[3], at 209–10 (1985)); *see also Stark v. Texas Co.*, 88 F.2d 182, 183 (5th Cir. 1937) (similar). In a series of early decisions, the Second Circuit suggested that the interlocutory jurisdiction granted by the statute extended little, if at all, beyond that paradigmatic context—*i.e.*, one in which liabilities have been fully adjudicated, "leaving only the question of damages for determination." *H. Lissner & Co. v. Oceanic Steam Nav. Co.*, 30 F.2d 290, 290 (2d Cir.

1929); *see also The Maria*, 67 F.2d 571, 571 (2d Cir. 1933) ("That statute was primarily intended to avoid the expense and delay of a reference to compute damages, since it is always possible that the libelant may later turn out to have no right to recover at all; and, although it would perhaps be too much to say that it covers that situation alone, it is hard to imagine other instances.").

This narrow understanding also comports with the statutory language. An order that has not yet found whether a plaintiff *in fact* has a "right" to recover from a defendant and whether a defendant *in fact* has a "liability" to a plaintiff cannot be said to have "*determined* the rights and liabilities of the parties." 28 U.S.C. § 1292(a)(3) (emphasis added). *See Determine*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 711 (1939) ("To settle a question or controversy about; to decide by authoritative or judicial sentence; as, the court has *determined* the cause."). Anything less than such a determination of rights and liabilities is simply the resolution of some preliminary issue and does not come within the statutory language. And that remains true even if the order resolves an important substantive legal question touching upon the merits of the controversy. Any more expansive reading of the statute would violate the settled rule that, as an exception to "the final judgment rule," § 1292(a)(3) must be "construed narrowly" to embrace only what comes within its plain terms. *Seattle First*, 772 F.2d at 568; *see also Schoenamsgruber v. Hamburg American Line*, 294 U.S. 454, 458 (1935).

Under this understanding of the statute, the jurisdictional issue in this case is easy. An order striking a particular defense as being inapplicable to the case at bar simply does not "determin[e]" the "rights and liabilities of the parties"

under any reasonable reading of those words.[4]  As the district court correctly observed in denying Plaintiff's request to authorize a discretionary appeal under § 1292(b), the striking of Defendants' affirmative defense of waiver neither established nor precluded Defendants' liability for *any* of the relief sought.  That was true, the district court noted, because it was undisputed that the asserted defense of waiver did *not* apply to Plaintiff's claims based on *gross* negligence.  *See Royal Ins. Co. v. Southwest Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999) (holding that "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence").  Because the motion to strike thus merely resolved whether Plaintiff would have to show gross negligence, rather than mere negligence, it did not settle in any respect whether or not Defendants are actually liable to Plaintiff.  The district court's order thus plainly does not fall within the scope of § 1292(a)(3).

**B**

But matters are not so easy, at least in this circuit.  As we noted in *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002), the Third, Fourth, and Fifth Circuits have all held—consistent with what I have sketched above—"that § 1292(a)(3) requires a determination of *actual* liability [or

---

[4] I express no view on the question whether, under the statutory language, *all* of the "rights and liabilities" of *all* of "the parties" must first be resolved before an appeal under § 1292(a)(3) would be authorized.  *See Chem One, Ltd. v. M/V Rickmers Genoa*, 660 F.3d 626, 640–41 (2d Cir. 2011) (adopting the "majority view" that § 1292(a)(3) "permits an interlocutory appeal when rights and liabilities have been determined between two of a number of parties, notwithstanding that disputes remain between one of them and others, as, for example, between the plaintiff and one of several defendants, or between a defendant and third-party defendant" (simplified)).

non-liability] by the district court." *Id*. at 833–34 (emphasis added) (citing *Evergreen Int'l (USA) Corp. v. Standard Warehouse*, 33 F.3d 420, 424 (4th Cir. 1994); *Bucher-Guyer AG v. M/V Incotrans Spirit*, 868 F.2d 734, 735 (5th Cir. 1989); and *Burgbacher v. Univ. of Pittsburgh*, 860 F.2d 87, 88 (3d Cir. 1988)).  However, we also correctly noted in *Wallis* that Ninth Circuit precedent had already departed from that narrow understanding of the jurisdiction conferred by § 1292(a)(3).  *Id*. at 832–33 (citing *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897 (9th Cir. 1989), and *Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165 (9th Cir. 1998)).  In line with those cases, we reaffirmed in *Wallis* that an order determining "the validity and applicability of a provision *limiting* liability" counts as a "decree[] . . . determining the rights and liabilities of the parties" within the meaning of § 1292(a)(3).  *Id*. at 834 (emphasis added).

Although this court in *Carman Tool* and *Vision Air* had simply asserted jurisdiction under § 1292(a)(3) without any analysis, we offered the following explanation in *Wallis* for upholding such jurisdiction over appeals of orders concerning "the validity and applicability of a provision limiting liability":

> If a district court holds that a limitation of liability clause is valid and applicable, that determination will, as a practical matter, usually end the case.  For example, in a COGSA [Carriage of Goods at Sea Act] case, if the district court has held that a plaintiff can recover no more than $500 if actual liability is established, an economically rational plaintiff will not ordinarily pursue the case to

judgment, and the correctness of the district court's determination of applicability of the liability limitation will never be reviewed.

Limitation of liability provisions are common in maritime cases, not limited to cases brought under COGSA. As we read § 1292(a)(3), it takes into account the practical problem posed by limitations of liability. Its explicit text of § 1292(a)(3) authorizes [appeals of] "interlocutory decrees." If the phrase "determination of the . . . liabilities," which occurs later in the same text, were construed to exclude a determination of limitations of liability from "interlocutory decrees," such a construction would make interlocutory appeals impossible in many admiralty cases, and would do so in precisely those cases where such appeals are most needed. We therefore hold that we have jurisdiction to decide this interlocutory appeal.

*Wallis*, 306 F.3d at 834.

As this excerpt makes clear, the reasoning in *Wallis*'s atextual and policy-based analysis rests on what has sometimes been described as the "death knell" theory of appellate jurisdiction—*i.e.*, that an interlocutory appeal should be allowed when the practical effect of an adverse ruling makes it economically infeasible or impractical for the losing party to continue litigating to final judgment. *See, e.g.*, *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 466 (1978). However, in its subsequent decision in *Baker*, the Supreme Court reaffirmed its longstanding rejection of any

such "death-knell doctrine" as a basis for recognizing exceptions to the final judgment rule. *Baker*, 582 U.S. at 29. Among other points, the Court emphasized that § 1292(b) expressly authorized *discretionary* appeals of certain "controlling question[s] of law" whose appellate resolution would "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and employing the death-knell doctrine to authorize immediate appeals, as of right, of potentially case-dispositive issues improperly "circumvented § 1292(b)'s restrictions." *Baker*, 582 U.S. at 29 (simplified). As the instant case starkly illustrates, *Wallis*'s death-knell-based expansive reading of § 1292(a)(3) contravenes *Baker*'s admonition against construing appellate jurisdictional provisions in a manner that would circumvent the limitations of § 1292(b). *Wallis* thus relied dispositively on reasoning that was later emphatically rejected by the Supreme Court. As a result, the continued validity of our holding in *Wallis*—which remains the subject of a lopsided circuit split—seems highly doubtful, to say the least.[5]

But even assuming *arguendo* that *Wallis* is not "clearly irreconcilable" with *Baker*, *see Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc), I disagree with the

---

[5] Since our decision in *Wallis*, the Eleventh Circuit has expressly rejected it and instead adopted the contrary position of the Third, Fourth, and Fifth Circuits. *See Wajnstat v. Oceania Cruises, Inc.*, 684 F.3d 1153, 1155–56 (11th Cir. 2012). Moreover, the Third and Fifth Circuits have reaffirmed their contrary positions and expressly rejected *Wallis*. *SCF Waxler Marine, L.L.C. v. ARIS T M/V*, 902 F.3d 461, 466 (5th Cir. 2018) (rejecting *Wallis*); *Estate of Hager ex rel. Hager v. Laurelton Welding Serv., Inc.*, 124 F. App'x 104, 106–07 (3d Cir. 2005). Either in this case, or in a subsequent case, we should consider eliminating this circuit split by overruling *Wallis* en banc.

majority's further expansion of *Wallis* in this case.  In asserting interlocutory appellate jurisdiction under § 1292(a)(3), our published opinions in *Wallis*, *Carman Tool*, and *Vision Air* each characterized the respective district court orders in those cases as having effectively imposed an *across-the-board* limitation on the defendants' liability.  Thus, in both *Carman Tool* and *Vision Air*, we stated that the respective district court orders had accepted the defendants' argument that any liability in the case, on *any* theory, was limited to a small, fixed amount.  *See Vision Air*, 155 F.3d at 1168 ("The district court granted [the defendants'] motion and issued an order granting partial summary judgment, limiting [the defendants'] liability to $1000.00."); *Carman Tool*, 871 F.2d at 899 (stating that "[a]ll parties moved for partial summary judgment as to whether defendants' liability is limited to $500 per package" and that "[t]he district court granted partial summary judgment in favor of defendants").[6]  In *Wallis*, we similarly explained that, because the district court ruling limited the defendants' liability in the case to $60,000, *Wallis* was "procedurally and jurisdictionally *identical* to *Carman Tool*":

> As an affirmative defense, Princess asserted
> that its liability, *if any*, for the death of Mr.

---

[6] In *Vision Air*, we held that negligence, gross negligence, and recklessness provided no basis for evading the liability cap in that case, but that *intentional* conduct was not subject to the cap.  *See* 155 F.3d at 1175.  And because we concluded that there was a triable issue as to whether some of the damages were intentionally caused, we reversed, to that limited extent, the district court's imposition of a *complete* cap on liability.  *Id*. at 1176.  In *Carman Tool*, we affirmed the district court's ruling and agreed that "defendants are entitled to COGSA's $500 per package limitation."  871 F.2d at 901–02.

> Wallis *is limited to roughly $60,000 pursuant to its Passage Contract*. Princess moved for partial summary judgment as to whether its liability is so limited, and the district court *granted* the motion. As in *Carman Tool*, the district court in our case has not decided whether Princess is actually liable for plaintiff's wrongful death claim. It has only decided that, if Princess were liable, its liability *would be limited pursuant to the contract*.

306 F.3d at 833 (emphasis added).

It is perhaps at least plausible to say—as these cases did—that, when a district court has determined that the defendants *in fact* had *no liability* for the entire category of damages above the relevant fixed amount, such a ruling has "*determin*[*ed*] the rights and liabilities of the parties" with respect to such further damages. 28 U.S.C. § 1292(a)(3) (emphasis added). But the same cannot be said in this case. As noted earlier, all that is at stake here is whether Plaintiff's claims for *negligence* will be knocked out of the case, leaving him only with his claims for gross negligence. Merely removing one legal theory of liability from a case does not "determin[e]" anything at all about Defendants' ultimate liability for any class of damages. Regardless of how Plaintiff's motion to strike is resolved, Defendants' liability *vel non* for any and all claimed damages remains entirely undecided, because the only issue at stake in that motion *is what Plaintiff will have to prove to recover*. The majority's expansion of *Wallis* to *that* distinct context blows a gaping hole in the final judgment rule in admiralty cases.

The majority does not and cannot dispute that, as written, our opinion in *Wallis* asserted jurisdiction under § 1292(a)(3) on the theory that, as in *Carman Tool* and *Vision Air*, the district court's ruling imposed a cap on the defendant's liability. Instead, the majority insists that, because this court had previously held that "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence," *Royal Ins. Co.*, 194 F.3d at 1016, the district court order at issue in *Wallis* must be understood as having left available to the plaintiffs for trial an *un-capped* claim for gross negligence. *See* Opin. at 12 n.8. With that additional "fact" engrafted into *Wallis*'s description of the facts of that case, the majority reasons, *Wallis* would then be on all fours with this case. The problem with this argument is that it rewrites *Wallis* to stand for something very different from what that opinion actually says. The *Wallis* opinion says nothing at all about any such exception for claims of gross negligence; indeed, that opinion affirmatively implies that the *Wallis* plaintiff's sole remaining claim under the Death on the High Seas Act ("DOHSA") was based *only* on negligence. *See Wallis*, 306 F.3d at 832 (stating that "the district court left for trial the issue of whether Princess was liable for a *negligent* search under DOHSA" (emphasis added)). Moreover, far from stating that the case involved only a *partial* liability cap that applied only to certain theories of liability and not to others, we said in *Wallis* that the district court order there involved a limitation of liability that was "*identical*" to the *across-the-board caps* at issue in *Carman Tool* and *Vision Air*. *See Wallis*, 306 F.3d at 833 (emphasis added). Contrary to what the majority seems to suggest, *Wallis* is binding precedent based only on the facts and rationale as we described them (rightly or wrongly) in that

decision. Because our opinion in *Wallis* asserted jurisdiction based on the clearly stated premise that the district court's order there was an across-the-board limitation of liability, that precedent provides no justification for the majority's extension of *Wallis*'s rule beyond that context.[7]

The majority's unduly expansive reading of § 1292(a)(3) also largely renders the limitations of § 1292(b) a dead letter in admiralty cases. If, as the majority claims, § 1292(a)(3) allows interlocutory appeals of pretrial orders that merely resolve the legal viability of one or more *alternative theories* of liability or defense, there is no practical need ever to resort to § 1292(b) in admiralty cases. The sort of threshold legal issues that the majority now brings within § 1292(a)(3)'s appeal-as-of-right are precisely the kind of "controlling question[s] of law" that come within the purview of § 1292(b), but that statute does not authorize an appeal unless the follow conditions are met: "there is substantial ground for difference of opinion"; an immediate appeal might "materially advance the ultimate termination of the litigation"; and both the district court and the court of appeals exercise their respective discretion to allow the appeal. 28 U.S.C. § 1292(b). None of those additional limitations in § 1292(b) makes any difference in admiralty

---

[7] As it turns out, the majority may be correct in speculating that our opinion in *Wallis* may have misdescribed the facts of that case. The answering brief of the defendants in *Wallis* described the district court order there as having "limit[ed] plaintiff's damages to approximately $60,000, unless she can prove [the defendants'] conduct was reckless." Brief of Appellees, *Wallis v. Princess Cruises, Inc.*, No. 01-56700, 2002 WL 32139357, at *6. But our opinions have precedential force only as written and not based on how (in light of research into the underlying case files) they *should* have been written. It is particularly problematic to extend *Wallis* to a fact pattern that we never mentioned in our opinion in that case and to which our stated rationale does not apply.

cases under the majority's overbroad reading of § 1292(a)(3), as this case vividly illustrates: here, the district court expressly held that these additional requirements were not met, but Defendants took the appeal anyway.  Thus, in addition to being unsupported by the text of the statute or our caselaw, the majority's flawed reading of § 1292(a)(3) improperly "circumvent[s] § 1292(b)'s restrictions." *Baker*, 582 U.S. at 29 (simplified).

Because we lack jurisdiction over this interlocutory appeal, I would dismiss Defendants' appeal and would not reach the merits.

## III

The majority, however, concludes that we do have jurisdiction, and it therefore proceeds to issue a binding precedential opinion as to the scope of the ban on liability waivers in § 30527.  In my view, the majority's construction of the statute is wrong.

## A

As noted earlier, § 30527 declares to be "void" any "provision" in a "contract" that "limit[s] . . . the liability of the owner, master, or agent" of a covered vessel "for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents."  46 U.S.C. § 30527(a)(1)(A), (2).  In holding that the statute is inapplicable here, the majority relies only on the threshold determination that the "vessel" in question—the *Dauntless*—does not fall within the subset of vessels that are

covered by the statute.[8]  I disagree with that conclusion and with the construction of § 30527 on which it is based.

The statute states that its prohibition on liability waivers applies to any "vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country."  46 U.S.C. § 30527(a)(1).[9] The plain language of the statute thus describes the covered "vessel[s]" by reference to the *travel* by which they "transport[] passengers": a "vessel" is covered only if it either "transport[s] passengers between ports in the United States" or transports them "between a port in the United States and a port in a foreign country."  46 U.S.C. § 30527(a)(1).  This language confirms that two things must be true for the vessel to be covered.

First, the vessel must be "transporting" "passengers" "between" ports—meaning that, if the vessel was never intended to be taken out into the water with its passengers, then it is not covered.  The statute would thus not apply to, say, a visit to the *Queen Mary* at its permanent mooring in Long Beach.  That makes sense, because if there is no plan for the ship ever to leave port, then the dangers associated with such transportation—which are ultimately what underly the rule against liability waivers—would never be

---

[8] The majority does not dispute that the *Dauntless* is a "vessel," and it clearly is.  For purposes of the U.S. Code, the term "vessel" expressly "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3.

[9] Effective December 23, 2022, § 30527 does not apply "to covered small passenger vessels" as defined in 46 U.S.C. § 30501(1).  *See* 46 U.S.C. § 30502(b).  No party has contended that this exception is relevant to our resolution of this appeal, and I express no view on that question.

implicated. In this respect, it is important to recognize that the enactment of § 30527's predecessor in 1936 partly served to codify the longstanding rule of maritime law and common law that, in order to ensure that common carriers by sea or by land would exercise "the highest degree of carefulness and diligence" with "regard to passengers," such carriers were barred from disclaiming liability towards such passengers. *See Liverpool & G.W. Steam Co. v. Phenix Ins. Co.*, 129 U.S. 397, 439–40 (1889); *id*. at 443–61 (rejecting the view that maritime law, at least in the United States, applied a different rule); *see also New York Cent. R.R. Co. v. Lockwood*, 84 U.S. 357, 384 (1873) (holding that a common carrier "cannot lawfully stipulate" to "exemption from responsibility for the negligence of himself or his servants" and that this rule applies "both to carriers of goods and carriers of passengers for hire, and with special force to the latter"); *The Oregon*, 133 F. 609, 630 (9th Cir. 1904) (holding, in an action for personal injuries suffered by passengers during a voyage, that if the "provision of the contract, relieving the carrier from responsibility for the negligence of the carrier . . . can be held to be applicable, it is clearly void by reason of being against public policy").

Second, the statute specifies that at least one of the ports in question must be a United States port. The obvious import of this requirement is to impose a *jurisdictional* element that excludes vessels transporting passengers entirely between *foreign* ports. *See Hodes v. S.N.C. Achille Lauro ed Altri-Gestione*, 858 F.2d 905, 914–15 (3d Cir. 1988) (stating that § 30527's predecessor was enacted to settle the "jurisdictional scope" of the maritime-law anti-liability-waiver rule and did so by "delimit[ing] the reach of American public policy to contracts of passage for voyages

that touch the United States"), *overruled on other grounds by Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989).

This particular aspect of § 30527(a)(1) traces back to the predecessor statute enacted in 1936,[10] and it reflected an important change in then-existing law. *Cf. Mendoza-Linares v. Garland*, 51 F.4th 1146, 1164 (9th Cir. 2022) ("Congress . . . is presumed to know the law."). Specifically, by excluding wholly foreign voyages from the statute's anti-liability-waiver rule, Congress thereby abrogated the Second Circuit's 1925 split decision in *Oceanic Steam Navigation Co. v. Corcoran*, 9 F.2d 724 (2d Cir. 1925). There, the plaintiff, a passenger on the *Canopic* as it traveled from Montreal to Liverpool, was seriously injured due to the alleged negligence of a ship steward. *Id.* at 725–26. Her ticket contained a liability-limiting provision, but the Second Circuit held that, because the contract was made in the United States, that provision was void. *Id*. at 726–27, 733. As the court explained, "[u]nder the admiralty law of the United States, a common carrier by sea cannot by any contract it makes exempt itself from all responsibility for loss or damage by perils of the sea arising from the negligence of its officers or crew." *Id*. at 727. Notably, the Second Circuit applied U.S. law on this point, even though application of English law would have led to a different conclusion; the contract expressly stated that it was governed by English law; and the ship was traveling exclusively between foreign ports. *Id*. at 728–33. Judge Hough

---

[10] *See* Ch. 521, 49 Stat. 1479, 1480 (June 5, 1936) (enacting § 4283B of the Revised Statutes) (stating that the prohibition on liability waivers generally applied to "any vessel transporting passengers between ports of the United States or between any such port and a foreign port").

dissented, arguing that the majority's application of U.S. law was "the apex of unreason." *Id*. at 733.

Under § 30527 and its 1936 predecessor, the now-codified rule voiding liability waivers for vessels transporting passengers would *not* apply to the sort of wholly foreign voyage at issue in *Oceanic Steam*, because that voyage did not involve transportation of passengers either "between ports in the United States" or "between a port in the United States and a port in a foreign country." 46 U.S.C. § 30527(a)(1). *See Hodes*, 858 F.3d at 914–15 (noting that *Oceanic Steam* was a departure from the then-existing caselaw and that Congress abrogated it by limiting the liability-waiver rule to "voyages that touch the United States").

Viewed against this backdrop, § 30527 clearly applies to the *Dauntless*. Because the *Dauntless* was "transporting passengers" from Lahaina (a "port[] in the United States"), out into the water, and then back to Lahaina (again, a "port[] in the United States"), the travel was "between ports in the United States." 46 U.S.C. § 30527(a)(1). The prohibition in that section therefore applies to the *Dauntless* as a threshold matter, leaving only the question of whether the substantive rule contained in § 30527(a) prohibits the type of liability waiver contained in *this* release.[11]

---

[11] As I note below, Defendants alternatively contend that § 30527(a) only precludes waiving liability that relates to the vessel's *transportation* of passengers and that the statute therefore does not preclude waivers of liability concerning *additional* potentially high-risk activities, such as scuba diving or snorkeling. *See infra* section III(C).

## B

The majority nonetheless concludes that, in addition to partly codifying the established maritime rule against liability waivers and excluding its application to wholly foreign voyages, Congress in § 30527 went further and also categorically excluded, from the coverage of that rule, any excursion trip that starts and ends in the *same* U.S. port.  That is incorrect.

First, the majority's view would effectively rewrite the statute as applying only to "transporting passengers between *different* ports in the United States."  As we have explained in another context, "[h]ad Congress intended to impose such a limitation, it could easily have added that simple word.  But it did not do so, and we cannot rewrite the statute to insert an additional restriction that Congress omitted."  *See Charboneau v. Davis*, 87 F.4th 443, 454 (9th Cir. 2023).  And under the language Congress wrote, there is no such different-ports requirement.  In maritime usage, a "port" can refer either to a "port of departure," which is "[t]he port from which a vessel departs on the start of a voyage," or to a "port of destination," which is "[t]he port at which a voyage is to end."  *Port*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Transportation "between ports" would thus be understood as transportation "between" a "port" of departure and a "port" of destination, and there is no conceivable logical reason why those ports cannot be the same.  And when, as here, they are the same, and that port happens to be in the United States, then the resulting travel is "between ports in the United States."

The majority contends that the requirement that the port of departure and the port of destination be *different* arises from the use of the word "between," which it says "implies

more than one." *See* Opin. at 16. In support of this contention, the majority notes, for example, that in the dictionary's illustrative phrases "the alley *between* the butcher shop and the pharmacy" and "should arrive *between* 9 and 10 o'clock," there are necessarily "two shops and two times." *See* Opin. at 15 n.11 (citation omitted). But it simply is not true that "between" *always* connotes two *different* reference points, as a few counter-examples will demonstrate. A runner halfway through a 400-meter race on a 400-meter oval running track is "between" the starting line and the finish line, even though they are the same line. Someone halfway through *Finnegan's Wake* is "between" the beginning and the end of the novel, even though it ends where it began. And Benjamin Harrison, like every past President except Washington, served "between" Presidents, even though in Harrison's case, those Presidents were the same person (Grover Cleveland). The difference in the two reference points in the majority's examples does not flow from anything inherent in the concept of "between"; rather, it is an artifice of these particular examples. Because there is no such thing as time travel, one cannot arrive, after a journey, at the *same* moment that one left; the times will necessarily be different. And if one describes an "alley" by reference to *its two physical sides* on the ground, those sides will necessarily be different, even if (to change the majority's example) the alley bisects a single shop. The point is that, although "between" is frequently used to link things that cannot be said to be the same, the majority is wrong in insisting that the word "between" "*necessarily*" implies that the two reference points must be distinct in all relevant senses. *See* Opin. at 16 (emphasis added). And, in particular, there is nothing peculiar about saying that a passenger is being transported "between ports" if he leaves

the port of Lahaina, travels around the Molokini Crater, and returns to the port of Lahaina.

Second, the majority's reading of the statute violates the rule that a "textually permissible interpretation that furthers rather than obstructs the [statute's] purpose should be favored." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012). The majority's reading of the statute is not compelled by its language, and we should not adopt it when it produces irrational distinctions that would pointlessly thwart the statute's evident objective. Even agreeing (as I do) that the majority is correct that a mooring buoy does not count as a "port," *see* Opin. at 19 n.14, the majority's refusal to apply the statute to an excursion that returns to the same port would produce distinctions that make no conceivable rational sense. The following hypotheticals illustrate the point:

- Two snorkel boats leave a Hawaiian harbor, headed to a pristine area off an adjacent island where sea turtles are known to swim. The first docks at an old wooden pier stretching out from the island; the second docks a hundred feet away, at a floating mooring buoy. On the majority's view, the passengers on the first ship are protected by § 30527(a), while the passengers on the second ship are not.

- Two ships leave the Port of Long Beach for identical day-long whale-watching trips off the California coast. The first is scheduled, upon its return, to dock at a different berth in the Port of Long Beach. The second is scheduled, upon return, to

dock at a nearby berth that is technically in the adjacent Port of Los Angeles.  On the majority's view, the passengers on the second ship are protected by § 30527(a), while the passengers on the first ship are not.

- A riverboat line offers scenic day tours with two slightly different itinerary options.  On the first, an on-board five-star chef prepares lunch, allowing passengers to enjoy the scenery without ever leaving the ship.  On the second, the ship docks for an hour at a pier that hosts a well-known local restaurant where the passengers will have lunch.  The voyages otherwise travel the same distance, show passengers the same sights, last for the same period of time, and return to the same port.  On the majority's view, the passengers on the second ship are protected by § 30527(a), while the passengers on the first ship are not.

     None of these distinctions makes even the slightest bit of sense.  As noted above, the self-evident objective of the statute—like the maritime rule it partly codified—is to preclude operators of vessels that carry passengers into the "perils of the sea" from disclaiming their responsibilities to exercise due care towards those passengers. *See Oceanic Steam*, 9 F.2d at 727.  Viewing the statute in that light, it makes no sense to say that the vessel operator's duty to protect against such perils turns on whether the ship touches a distinct port.  Congress, of course, is free to enact

seemingly irrational statutes, subject to minimum constitutional limits. But we should not lightly assume that Congress has chosen that route—particularly where a perfectly rational alternative construction is available, compatible with the statutory text and context, and supported by the maritime-law principles underlying the statute. The majority opinion assumes that Congress chose to be irrational in this instance. I do not.

Accordingly, I conclude that the *Dauntless* counts as a "vessel transporting passengers between ports in the United States." 46 U.S.C. § 30527(a)(1).

## C

The key remaining merits question is whether Defendants are correct in alternatively contending that, even if § 30527(a) applies as a threshold matter to the *Dauntless*, the statute does not void a liability waiver *for snorkeling or scuba diving*. In support of this argument, Defendants cite the Eleventh Circuit's decision adopting this view, at least with respect to additional activities that do not occur on the ship itself. *See Shultz v. Fla. Keys Dive Ctr., Inc.*, 224 F.3d 1269, 1271 (11th Cir. 2000) (holding that the predecessor to § 30527 did not apply to a "liability release to participate in the recreational and inherently risky activity of scuba diving"); *cf. Johnson v. Royal Caribbean Cruises, Ltd.*, 449 F. App'x 846, 848–49 (11th Cir. 2011) (holding, without citing *Shultz*, that § 30527's predecessor applied to an *on-board* "simulated surfing and body boarding activity," because "[t]he statute contains no exceptions regarding the type of activity—whether recreational, ultra hazardous, or otherwise—in which the passenger is partaking when the injury occurs"). Defendants also note that, in addressing the common law liability of common carriers prior to the

enactment of § 30527's predecessor, the Supreme Court had held that the common law prohibition of liability waivers for common carriers did not extend to "*special engagements* which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation." *Sante Fe, Prescott & Phoenix Ry. Co. v. Grant Bros. Constr. Co.*, 228 U.S. 177, 185 (1913) (emphasis added); *see also id.* ("Manifestly, this rule [against liability waivers] has no application when a railroad company is acting outside the performance of its duty as a common carrier."). Plaintiff counters that Defendants' proposed restriction on the scope of § 30527's anti-liability-waiver rule simply lacks any basis in the statutory text and therefore was properly rejected by the district court.

Under the unique circumstances of this appeal, I decline to address this question. As I have explained, in my view, we lack jurisdiction over this appeal, and we therefore lack the power to say anything about its merits. Given that the majority has concluded that we *do* have jurisdiction and has issued a binding precedential opinion holding that § 30527 does not apply to excursions to and from the same port, I nonetheless think it is appropriate for me—despite my dissent on the jurisdictional issue—to proceed to point out why the majority's conclusion on *that* particular merits issue is incorrect and should not have been made the binding law of this circuit. But having done so, I see no reason why I should say anything more. Doing so would be to further exercise a jurisdiction that I do not think we have in order to gratuitously provide my views on additional merits issues that the majority has *not* discussed. I therefore decline to say anything further concerning the merits of the remaining

issues concerning § 30527 that the majority found unnecessary to reach.[12]

\* \* \*

For the reasons I have set forth, I would dismiss this appeal for lack of jurisdiction. To the extent that the majority does otherwise, I respectfully dissent.

---

[12] I agree with that majority's holding that, to the extent we have jurisdiction over this appeal, the district court did not err in concluding that Plaintiff had failed to show, as a matter of law at the pleading stage, that Defendants would be unable to establish facts that would defeat the applicability of the distinct anti-liability-waiver provision in Hawaii Revised Statutes § 663-1.54.